# Exhibit 3

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| AFTERSCHOOL FOR CHILDREN AND TEENS NOW (ACT NOW) COALITION and METROPOLITAN FAMILY SERVICES<br><br>     Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF EDUCATION and LINDA McMAHON, in her official capacity as Secretary, U.S. Department of Education,<br><br>     Defendants. | Case No. |

**DECLARATION OF RONALD PETRACCA**

Pursuant to 28 U.S.C. § 1746, I, Ronald Petracca, declare as follows:

1.     I am over the age of 18 and have personal knowledge of all the facts stated herein. If called as a witness, I could and would testify competently to the matters set forth below.

2.     This declaration is submitted in support of Plaintiff's Complaint and Request for a Temporary Injunction.

3.     For nearly 45 years, from October 5, 1980, through February 8, 2025, I worked in the Office of General Counsel (OGC) in the U.S. Department of Education (Department). From around 2010 through my retirement earlier this year, I helped lead OGC's Discretionary Grants Practice Team. The Discretionary Grants Practice Team served as a central point within OGC for identifying and working through novel, complex, and cross-cutting grant issues. As such, it functioned as a forum for on-going professional development and problem solving that helped ensure a consistent approach across OGC to resolving discretionary grant level issues.

1

Doc ID: 3cd6b395d76c163cffbccd6198a9c3cbbda1cc47

4.     I hold a bachelor's degree from the State University of New York at Cortland, and a juris doctor from the Catholic University of America, Columbus School of Law.

5.     As a former lead for OGC's Discretionary Grants Practice Team, I am familiar with the relevant statutes and regulations that govern the Department's competitive (also known as discretionary) grant programs.

6.     In my experience working on competitive grant programs for over 45 years, I am not aware of any decision to deny a continuation of an award on the basis of changing administration priorities or "the interests of the Federal government."

7.     Congress, through multiple statutes, has required the Department to award competitive grants. A competitive grant "is one that permits the Secretary to use discretionary judgment in selecting applications for funding." 34 C.F.R. § 75.1(b).

8.     The Elementary and Secondary Education Act (ESEA), Pub. L. No. 89-10, 79 Stat. 27 (1965), as amended by the Every Student Succeeds Act (ESSA), Pub. L. No. 114-95, 129 Stat. 1802 (2015) creates 20 overarching competitive grant programs, many of which consist of multiple competitive awards that provide support in areas ranging from school safety to educator recruitment and training.

9.     One such competitive grant program is the Full-Service Community Schools (FSCS) program, authorized by Title IV, Part F, Subpart 2 of the ESEA. 20 U.S.C. §§ 7271–7275. The statutory provision creating this program directs that the Secretary "shall use not less than 95 percent [of appropriated funds made available] to award grants, on a competitive basis," to eligible entities seeking to provide assistance to public elementary schools or secondary schools to support their function as full-service community schools. 20 U.S.C. § 7273(a)(2)(B).

2

Doc ID: 3ed6b395d76e163effbeed6198a9e3cbbda1ec47

10. The determination of which entities are eligible to apply for a competitive grant "is governed by the applicable statutes and regulations," 34 C.F.R. § 75.50, namely the statutory authorization for the program under which the competition is being held, any relevant language in the annual Appropriation Act for the program in question, any program-specific regulations or other requirements established through rulemaking or under a valid exemption to rulemaking, the Education Department General Administrative Regulations (EDGAR), and the General Education Provisions Act (GEPA).

11. Under EDGAR, priorities for a competitive grant program must be announced in the Federal Register, usually in the Notice Inviting Applications ("NIA"). Id. § 75.105(b)(1). Those priorities must be established through Notice and Comment rulemaking unless the priorities are invitational, that is to say confer no competitive advantage if addressed, authorized by statutory language, or exempt from rulemaking. Id. § 75.105(b). The process set forth in the Department's regulations generally requires the Secretary to select funding recipients "on the basis of applicable statutes and regulations, the selection criteria, and any priorities or other requirements that have been published in the Federal Register." Id. § 75.217(a).

12. To open grant competitions, the Secretary must "publish[] application notices"— the NIA referenced supra ¶ 10—in the Federal Register, explaining, among other things the type of assistance that is available, how to apply, any application requirements, competitive or absolute priorities, and the selection criteria (chosen from a list of options enumerated in Department rules) that will be used to evaluate applications. Id. §§ 75.100, 75.200, 75.209, 75.210. These requirements—other than certain procedural rules—are drawn from applicable statutory provisions, regulations, or another Federal Register Notice, such as a Notice of Final

3

Doc ID: 3cd6b395d76c163cffbccd6198a9c3cbbda1cc47

Administrative or Secretarial Priorities, that have been through Notice and Comment rulemaking unless, as noted above, an applicable exception applies.

13. The Secretary may award competitive grants "only to an eligible party that submits an application." Id. § 75.104(a). "Eligible parties" are the entities defined by the relevant program statute.

14. Application notices are typically published in the Federal Register at least 45 to 60 days in advance of the deadline for submissions and approximately four to six months before funds must be awarded before lapsing. Applicants need time to coordinate with partners and institutional stakeholders, to create a budget, and to draft a narrative. It is not possible to have a meaningful application period of less than 30 days. U.S. Department of Education, Handbook for the Discretionary Grant Process ("Handbook") § 2.5.6(C)(2) (2024).

15. After applications are received by the Department, program office staff do a preliminary review of the applications to ensure that they were received in a timely manner, were submitted by an eligible party, and propose activities that are allowable under the authorizing legislation for the program and any competition specific priorities. Id. § 3.4.4. The applications are then mailed to outside peer reviewers. Peer reviewers are selected based on their subject matter expertise, any available information concerning their prior performance as peer reviewers, and their availability during the peer review process. Id. § 3.5.4. The process, from the Department's receipt of the application to their transmission to peer reviewers, generally takes about two weeks.

16. For most discretionary grant competitions, peer review panels consist of three to five members. Once the peer reviewers receive the applications, they must initially ensure that they do not have any conflicts of interest with respect to the applications that they have been

assigned to review. They must then read the applications, rate the applications based on the selection criteria, competitive priorities (if applicable), provide comments that justify their scores, and meet with other peer review panel members to discuss the applications for the purpose ensuring that each peer reviewer has as complete an understanding of the application as possible before finalizing their scores. This process has, in my experience, generally taken about three weeks. Handbook ch. 3.

17. After the peer review process is complete, the Secretary first "prepares a rank order of the applications based on" the selection criteria, feedback from the peer review process if applicable, and any competitive preference points. 34 C.F.R. § 75.217(c). She next "determines the order in which applications will be selected for grants." Id. § 75.217(d). To select applicants for funding, the regulations require the Secretary to consider the information in the applications, the rank ordering of the applications, and other relevant information, including information about an applicant's use of funds, performance, and compliance with conditions under a previous Department award. Id.

18. After identifying applications that fall within the funding range based on the rank order, but before making awards, the Secretary must conduct a "cost analysis of the project," which is the "basis for determining the amount of the grant to the applicant." Id. § 75.232. The Secretary has discretion to "fund up to 100 percent" of the applicant's allowable costs. Id. § 75.233. This cost analysis, described in Section 4.9.1 of the Handbook, involves determining if the costs the applicant has proposed to charge to its potential grant are consistent with applicable statutory and regulatory requirements, in particular the provisions in 2 C.F.R. Part 200 concerning the allowability of costs. Specifically, the Uniform Guidance requires that costs charged to federal grants be reasonable, necessary, and allocable. 2 C.F.R. pt. 200 subpart E. This

5

Doc ID: 3cd6b395d76a163cffbccd6198a9a3cbbda1ac47

review must be done in a thorough and conscientious manner to ensure that grants, once they are awarded, do not use funds for unallowable or excessive costs. Any unresolved issues about an applicant's eligibility for an award must be resolved. In addition, a Slate Memorandum, which, among other things, documents the competitive process and the results of the risk review, including any recommended specific conditions to address concerns about a particular applicant and a description of any novel issues that arose during the competitive process. For some competitions, determinations must be made on whether the applicant has documented that it will meet an applicable matching requirement, has met a requirement for having its proposed intervention supported by a required level evidence, or met another program requirement. These issues are all addressed in the Slate Memorandum, which is subject to Department clearance. Handbook chs. 4 and 5.

19.     Finally, before awards are made, Congressional notification (usually two business days) is provided; the final paperwork needed to issue a grant is prepared, most importantly preparation of a Grant Award Notice, is completed; and the awards are issued. The steps described in this and the prior paragraph, in my experience, generally took about 30 days. Handbook ch. 5.

20.     This full process described in paragraphs 13 through 18 above, from the date of publication of an NIA in the Federal Register until issuing of awards, generally takes between 110 and 125 days. A competition with few applicants and comparatively simple requirements could take less time. This estimate is based on staffing levels that existed in the agency prior to my retirement, and the changes in available personnel within the agency to perform this complex and difficult work could lead to longer time periods if concerns about quality control and legal sufficiency are to be properly addressed.

Doc ID: 3ed6b395d76e163cffbeed6198a9e3cbbda1ec47

21.     "The Secretary may approve a project period of up to 60 months to perform the substantive work of a grant unless an applicable statute provides otherwise." 34 C.F.R. § 75.250. But "[t]he Secretary usually approves a budget period of not more than 12 months, even if the project has a multi-year project period." Id. § 75.251(a). "If the Secretary approves a multi-year project period, the Secretary: (1) Makes a grant to the project for the initial budget period; and (2) Indicates his or her intention to make contination [sic] awards to fund the remainder of the project period." § 75.251(b).

22.     The Department is required to make most of its discretionary grants in the fiscal year ("FY") for which the funds in question were appropriated. Thus, for FY 2025, most discretionary awards will need to be awarded by September 30, 2025. There are some programs, including the Full-Service Community School grant, which are allowed by the FY 2025 Appropriations Act for the Department to extend availability until December 31, 2025, to make new and continuation awards. And, in some cases, discretionary grants are funded with appropriated funds that have two-year availability. As a general matter, the Department will need to make its discretionary grant awards and continuation awards by either September 30th or December 31st of this year, or the funds in question will lapse and no longer be available for award.

23.     In recent years, approximately 60 attorneys in OGC provided legal support to program and other offices in executing the various tasks described in the preceding paragraphs. This legal support included reviewing the text for all NIAs before they were published to ensure compliance with the formatting requirements of the Federal Register and that the NIAs contained all required information; accurately and thoroughly conveyed the substance of application requirements, selection criteria, eligibility requirements, and priorities; and met rulemaking

7

Doc ID: 3ed6b395d76o163cffbeed6198a9e3cbbda1ec47

requirements. After the NIAs were issued, OGC assisted program offices in conducting pre-application webinars for potential applicants, answering applicant questions, reviewing peer review orientation presentations, reviewing the Application Technical Review Plan, and dealing with issues that arise if an applicant is having difficulty submitting its electronic application. Once the peer review process began, OGC assisted program offices in answering peer reviewer questions and questions concerning peer reviewer conflicts of interest and replacements. Once the peer review process was completed, OGC attorneys reviewed the Slate Memorandum; reviewed any specific conditions being imposed on grantees; answered questions about the risk review process, eligibility issues, and allowable costs in proposed budgets; and, where applicable, answered questions about matching and evidence requirements. Last year, FY 2024, the Department published about 70 competition notices as was typical (This number can vary from year-to-year).

24.     Given the significant reduction in OGC staff related to the March 2025 reduction in force, I believe there are serious questions about the capacity of OGC to provide the support needed to the rest of the agency in conducting a legally sufficient and timely discretionary grant award process when only a handful of attorneys remain in the office and those attorneys are responsible for dealing with all agency legal issues. My concerns are evidenced by the untimely, formulaic and insufficient nature of the notices of non-continuation received by FSCS grantees on December 12, 2025.

25.     The Department regulations provide that in order to receive a continuation award, the grantee must demonstrate progress in achieving the project's goals and objectives or that it can modify its project in a way that will allow it to meet those goals and objectives, submit all required reports, continue to meet all eligibility requirements, maintain the requisite financial and

8

administrative management systems, and "[r]eceive a determination from the Secretary that continuation of the project is in the best interest of the Federal Government." 34 C.F.R. § 75.253(a)(5); see id. § 75.253(a). The Secretary "may decide not to make a continuation award" if the "grantee fails to meet any of" these requirements. Id. § 75.253(f)(1). The Secretary must "notify the grantee of that decision" and "the grounds on which it is based." Id. § 75.253(g). The Secretary must also "provide the grantee with an opportunity to request reconsideration of the decision" as required by 2 C.F.R. § 200.342. 34 C.F.R. § 74.253(g).

26. The Department's continuation evaluation process is not based on the grant application, but on the grantee's progress in implementing the grant. The Department's evaluation relies heavily on the grantee's Annual Progress Report, submitted precisely for the purpose of "demonstrating progress in achieving the project's goals and objectives," with the application serving as its initial guide against which to measure progress. Making a substantial progress determination involves laying the application down next to the state of performance reported in the budget period. The Department's Handbook for the Discretionary Grant Process states that, before making a continuation award, program offices are to determine "that continuing funding is in the best interest of the Federal government (e.g., the program staff believes the project continues to serve the priorities of the program) (see EDGAR § 75.253 (a)(4))." Handbook at Section 6.7.4 A(4), page 285).

27. The Department's Handbook for the Discretionary Grant Process states that discontinuation determinations are made "no earlier than 90 days before the end of a grantees budget period." Handbook § 6.7.4(B)(4). This timeline makes sense, because the Department is unable to meaningfully assess whether there has been progress on a project and whether continuation is in the best interest of the government before reviewing a grantee's annual report.

9

28. In my 45 years at the Department, I witnessed six changes in administration. Termination of any type of competitive grant was exceedingly rare and only tied to significant concerns related to project performance. I am not aware of a single competitive grant that was discontinued simply because the new administration disagreed with the priorities addressed in that grant. Although the governing regulations permit discontinuation when a grantee does not "[r]eceive a determination from the Secretary that continuation of the project is in the best interest of the Federal Government," 34 C.F.R. § 75.253(a)(5), to my knowledge, that provision has never been used to discontinue an entire cohort of grants awarded under a particular program without a project-specific assessment of each grant being discontinued. As a Senior Counsel within OGC, if I had become aware that program staff intended to send a notice of non-continuation based on a change in political priorities, I would have advised the Department that doing so would not be legally defensible.

29. I am aware that the Department distributed boilerplate non-continuation notice letters to recipients of FSCS grants that were based entirely on language in their applications that was, in most cases, either part of a statutorily required GEPA section 472 response regarding equitable provision of services, or language not related to the actual programs and activities proposed for grant funds. This, definitionally, is not a meaningful evaluation of whether the grantee has made substantial progress as a basis for non-continuation. Even if problematic activities had taken place – and the Department has provided no evidence that they have – it is arbitrary and capricious to discontinue the grant without providing the grantees a meaningful opportunity to repair.

30. I am also concerned that the timing of this notice of a denial of a continuation award, coming so close to December 31, 2025, the date by which the funds in question will lapse

10

Doc ID: 3ed6b395d76e163cffbeed6198a9e3cbbda1ec47

if not awarded to a grantee, deprives the grantee of an opportunity to exercise its right to request reconsideration in a meaningful way and for the Department to properly consider that request. While they submitted annual progress reports in August, the grantees did not receive any indication that the Department would not continue their grants until they received notices of non-continuation after the close of business on Friday, December 12, 2025. The grantees were given until December 19 to respond and request reconsideration. Their budget period ends on December 31, 2025, giving an understaffed Department one and a half weeks, during year end holidays, to consider multiple requests for reconsideration covering significant and complex programs.

31.     It is my opinion that these discontinuations are not legally defensible and that the law requires the Department to make individualized determinations prior to discontinuing a competitive grant and provide the grantees an opportunity to modify the activities to be carried out by their projects to address the Federal interest concern raised by the Department.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on December 29 , 2025.

*Ronald Petracca*

11

Doc ID: 3cd6b395d76c163cffbccd6198a9c3cbbda1cc47