**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| AFTERSCHOOL FOR CHILDREN AND TEENS NOW (ACT NOW) COALITION and METROPOLITAN FAMILY SERVICES, <br><br> *Plaintiffs*, <br><br> v. <br><br> U.S. DEPARTMENT OF EDUCATION and LINDA McMAHON, in her official capacity as Secretary, U.S. Department of Education, <br><br> *Defendants*. | Case No. 1:25-cv-15704 <br><br> Hon. Martha M. Pacold |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................................... 1

II. BACKGROUND .................................................................................................................. 3

    A. Plaintiffs' Full-Service Community Schools Grants ............................................................. 3

    B. The Legal Framework Governing Multi-Year Awards ........................................................ 4

    C. The Department's Discontinuations & Denials of Reconsideration .................................. 6

III. LEGAL STANDARD ........................................................................................................ 10

IV. ARGUMENT ..................................................................................................................... 10

    A. Plaintiffs are Likely to Succeed on the Merits ................................................................. 10

        1. The Department Violated the Administrative Procedure Act ..................................... 11

            a. The Department Acted Contrary to Law by Violating Its Own Regulations ....... 11

            b. The Department Acted Contrary to Law by Creating an "Anti-DEI" Standard Without Notice and Comment .............................................................................. 12

            c. The Department Exceeded its Authority by Penalizing Compliance with Statutory Mandates ........................................................................................... 15

            d. The Department's Actions Were Arbitrary and Capricious ............................... 15

        2. The Department Violated the Constitution .............................................................. 17

            a. The Department Violated the Separation of Powers and Spending Clause .......... 17

            b. The "Best Interest" Standard as Applied Is Unconstitutionally Vague ................ 18

            c. The Department Violated Plaintiffs' Right to Due Process ............................... 20

            d. The Department Violated Plaintiffs' Right to Free Speech ............................... 21

    B. Plaintiffs Will Suffer Irreparable Harm Absent Immediate Relief ................................. 22

    C. The Balance of Equities and the Public Interest Strongly Favor Preliminary Relief ....... 26

V. CONCLUSION .................................................................................................................. 27

**Cases**

*Bd. of Educ. of City Sch. Dist. of City of New York v. U.S. Dep't of Educ.*,
No. 1:25-08547, 2026 WL 948205, (S.D.N.Y. Apr. 8, 2026) ............................................ 14-15

*Bennett v. New Jersey*,
470 U.S. 632 (1985) ............................................................................................................ 14

*Bevis v. City of Naperville, Ill.*,
85 F.4th 1175 (7th Cir. 2023) ............................................................................................ 10

*Boucher v. U.S. Dep't of Agric.*,
934 F.3d 530 (7th Cir. 2019) ....................................................................................... 11, 16

*Christensen v. Harris Cnty.*,
529 U.S. 576 (2000) ............................................................................................................ 13

*Citizens Ins. Co. v. Wynndalco Enters., LLC*,
70 F.4th 987 (7th Cir. 2023) .............................................................................................. 19

*City of Chicago v. Barr*,
961 F.3d 882 (7th Cir. 2020) ................................................................................... 14, 17, 18

*City of Chicago v. Sessions*,
888 F.3d 272 (7th Cir. 2018) .............................................................................................. 14

*Cnty. of Santa Clara v. Noem*,
815 F. Supp. 3d 979 (N.D. Cal. 2025) .............................................................................. 18

*DM Trans, LLC v. Scott*,
38 F.4th 608 (7th Cir. 2022) ........................................................................................ 22, 26

*Exelon Generation Co. v. Local 15, Int'l Bhd. of Elec. Workers, AFL-CIO*,
676 F.3d 566 (7th Cir. 2012) .............................................................................................. 13

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ............................................................................................................ 13

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012) ............................................................................................................ 19

*FDA v. Wages & White Lion Invs., LLC*,
604 U.S. 542 (2025) ............................................................................................................ 16

*Israel v. U.S. Dep't of Agric.*,
282 F.3d 521 (7th Cir. 2002) .............................................................................................. 11

*Kisor v. Wilkie,*
588 U.S. 558 (2019) ......................................................................................... 13

*La. Pub. Serv. Comm'n v. FCC,*
476 U.S. 355 (1986) ......................................................................................... 15

*Life Spine, Inc. v. Aegis Spine, Inc.,*
8 F.4th 531 (7th Cir. 2021) ........................................................................ 22, 26

*Massey v. Johnson,*
457 F.3d 711 (7th Cir. 2006) ........................................................................... 21

*Midwest Fence Corp. v. U.S. Dep't of Transp.,*
840 F.3d 932 (7th Cir. 2016) ........................................................................... 19

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) ............................................................................... 15-16, 17

*New York v. United States,*
505 U.S. 144 (1992) ......................................................................................... 18

*Nieves v. Bartlett,*
587 U.S. 391 (2019) ......................................................................................... 21

*Nken v. Holder,*
556 U.S. 418 (2009) ................................................................................... 10, 26

*OPM v. Richmond,*
496 U.S. 414 (1990) ......................................................................................... 17

*Pennhurst State School and Hosp. v. Halderman,*
451 U.S. 1 (1981) ............................................................................................. 18

*Perry v. Sindermann,*
408 U.S. 593 (1972) ......................................................................................... 20

*Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't of Health,*
699 F.3d 962 (7th Cir. 2012) ........................................................................... 21

*Rhode Island Coal. Against Domestic Violence v. Kennedy,*
812 F. Supp. 3d. 180 (D.R.I. 2025) ................................................................. 19

*Rosenberger v. Rector & Visitors of Univ. of Virginia,*
515 U.S. 819 (1995) ......................................................................................... 21

*Rumsfeld v. Forum for Acad. and Inst. Rights, Inc.,*
547 U.S. 47 (2006) ........................................................................................... 22

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947)...........................................................................................16

*United States v. Am. Library Ass'n, Inc.*,
    539 U.S. 194 (2003)...........................................................................................22

*United States v. Nixon*,
    418 U.S. 683 (1974)...........................................................................................13

*United States v. Williams*,
    553 U.S. 285 (2008)...........................................................................................19

*Washington v. U.S. Dep't of Educ.*,
    813 F. Supp. 3d 1222 (W.D. Wash. 2025)................................................passim

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)..............................................................................10, 22, 26

*Woodruff v. Mason*,
    542 F.3d 545 (7th Cir. 2008) .............................................................................21

*Young v. United Parcel Service, Inc.*,
    575 U.S. 206 (2015)...........................................................................................13

**Statutes**

5 U.S.C. § 553 ......................................................................................................12

5 U.S.C. § 706......................................................................................... 11, 12, 15

20 U.S.C. § 1221................................................................................................... 4

20 U.S.C. § 1228........................................................................................ 4, 15, 18

20 U.S.C. § 1232....................................................................................... 4, 13

20 U.S.C. § 7271....................................................................................... 4, 27

20 U.S.C. § 7273.................................................................................... 4, 5, 14

20 U.S.C. § 7275................................................................................................. 18

**Regulations**

2 C.F.R. § 200.340(c)............................................................................................ 8

34 C.F.R. § 75.118 ................................................................................................ 5

34 C.F.R. § 75.253 ........................................................................................passim

**Constitutional Provisions**

U.S. CONST. art. I, §§ 8, 9 .................................................................................... 17

**Other Authorities**

*Department Grant Discontinuation and Termination Processes*, U.S. DEP'T OF EDUC. ................. 9

Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025) ........................................... 6

Exec. Order No. 14332, 90 Fed. Reg. 38929 (Aug. 7, 2025) .......................................... 7

Final Regulations, Education Department General Administrative Regulations and Related
Regulatory Provisions, 89 Fed. Reg. 70316 (Aug. 29, 2024) ........................................ 9

Mark Lieberman, *Educator Layoffs Loom as Canceled Community School Grants Remain in
Limbo*, EDUCATION WEEK (Jan. 6, 2026) ................................................................. 7

Memo. from Att'y Gen. to All Federal Agencies, *Re: Guidance for Recipients of Federal
Funding Regarding Unlawful Discrimination* (July 29, 2025) ....................................... 7

U.S. Dep't of Educ., Handbook on Discretionary Grant Awards ................................... 27

U.S. DEP'T OF EDUC., *U.S. Department of Education Takes Action to Eliminate DEI,*
Press Release (Jan. 23, 2025) ............................................................................... 6

## I.    INTRODUCTION

Absent preliminary injunctive relief, thousands of Illinois school children will lose vital support services, the network Plaintiffs and their community partners built to deliver those services will disappear, and Defendants' blatantly unlawful action will become a *fait accompli*.

Plaintiff Afterschool for Children and Teens Now Coalition ("ACT Now") is an Illinois not-for-profit that runs two Full-Service Community School ("FSCS") grants in Illinois. Plaintiff Metropolitan Family Services, ACT Now's fiscal sponsor, applied for the grants on ACT Now's behalf. Congress created the FSCS program to support wrap-around services for students in high-poverty communities, including after-school care, summer camp, STEM programs, tutoring, mentoring, food assistance, health services and more. In two years, ACT Now built a statewide network of 100+ organizations providing out-of-school-time programs and technical assistance across dozens of programs. ACT Now's FSCS programs reflect documented success benefiting 16 Illinois urban and rural school districts, 32 schools and more than 19,000 students and their families.

The Defendants now want to kill those programs—two years into a five-year project they approved—for no reason except that Plaintiffs made certain statements about diversity, equity, and inclusion ("DEI") in their grant applications. Following directives of the President to root out DEI, the Department of Education summarily axed nineteen FSCS grants, including Plaintiffs', whose 2023 applications included positive statements about equity and inclusion. The Department asserted without explanation that those statements, some required by statute, "conflict" with the 2025 Administration's "priorities and policy preferences" and are therefore "inconsistent" with the "best interests of the Federal government." Strikingly, the Department took this action without considering Plaintiffs' actual *performance* as required under controlling

1

law. This was arbitrary and capricious. It was also blatantly unconstitutional because, among other reasons, it punishes ACT Now (and the children they serve) for expressing its beliefs unrelated to performance under the grants.

Plaintiffs respectfully request preliminary relief to return the parties to their positions prior to the Department's unlawful non-continuations and to prevent further irreparable harm.

*First*, the record supports Plaintiffs' likely success on the merits. The law does not allow the Department to discontinue grants because it now disfavors their application language regarding DEI. Therefore, the non-continuations are unlawful and Plaintiffs are likely to prevail.

*Second*, without this relief, ACT Now and the children they serve will suffer irreparable harm. Starting on July 1, ACT Now will be forced to cease operations, fire staff, and shutter what remains of their programs. The infrastructure ACT Now painstakingly built over the last two years will collapse as employees find work elsewhere and partners undertake new activities and commitments. Illinois schools, barred from contracting with Plaintiffs while the non-continuations are in effect, will continue ending partnerships with ACT Now and laying off or terminating community-school staff. And 19,000 kids will permanently lose vital services keeping them safe, healthy, and focused on school. These injuries cannot be remedied by awarding damages. Preliminary injunctive relief is the only relief that can avoid these harms.

*Finally*, the equities and the public interest weigh entirely in favor of preliminary relief. Thousands of students rely on ACT Now's services—services Congress deemed in the public interest when it created the FSCS program. The Department suffers no harm from being enjoined, while this court considers the merits, from enforcing actions that threaten ACT Now with imminent collapse.

## II. BACKGROUND

### A. Plaintiffs' Full-Service Community Schools Grants

Plaintiffs' Full-Service Community Schools programs ensure that children living in poverty receive food, clothes, supplies, healthcare, and transportation, so that the lack of these essentials to learning and healthy development does not hinder their progress in school. *See* Decl. of Susan Stanton, Ex. 1, ¶ 28. ACT Now tailors its supports to meet community-identified needs like combating learning loss, rural health disparities, and urban street violence. *See* Stanton Decl., Ex. 1, ¶¶ 17, 27. Plaintiffs center equity and racial justice in their mission to ensure "that all youth are prepared for success in school, career, and life, through participation in high-quality community schools programs." Grant Applications, Dkt. 3, Ex. 4 at 38.

ACT Now has complied with all requirements and met or exceeded its programmatic benchmarks. ACT Now measures impact by analyzing data from community partners related to, among other factors: student attendance, engagement, and academic indicators; family participation and parent leadership development; stability of staffing and service coordination within schools; strength of school-community partnerships; and qualitative outcomes reported by districts and families. Just two years in, ACT Now's programs were showing strong signals of success. Community School partners had already seen reduced rates of chronic absenteeism— more than double the statewide reduction rate—and increased family engagement. *See* Stanton Decl., Ex. 1, ¶¶ 27, 31–32; Decl. of Lesley Rivers, Ex. 2, ¶ 12; Decl. of Michael Guilmette, Ex. 4, ¶¶ 5–8, 13; Decl. of Phillip Hosfeldt, Ex. 6, ¶¶ 11–12. One school saw a 30% decrease in chronic absenteeism in just one year that it attributed to ACT Now's support. Decl. of Sydney Stigge-Kaufman, Ex. 17, ¶ 16. In issuing the 2024 and 2025 Grant Award Notifications, the Department cited no performance concerns. See Dkt. 3, Ex. 6.

### B. The Legal Framework Governing Multi-Year Awards

Comprehensive statutory and regulatory requirements govern how the Department may lawfully administer federal education awards. The General Education Provisions Act, the FSCS statute, and the Department's General Administrative Regulations establish the processes for creating grant competitions, considering applications, and awarding funds. The Administrative Procedure Act and the Constitution further bound the Department's conduct.

Through the General Education Provisions Act (GEPA), Congress declared "the policy of the United States of America that every citizen is entitled to an education to meet his or her full potential without financial barriers." 20 U.S.C. § 1221-1(2). To assist the Department in implementing that policy, Congress requires each Education grant applicant to describe proposed steps "to ensure equitable access to, and equitable participation in" their proposed project, "by addressing the special needs of . . . program beneficiaries" to overcome barriers to such participation, "including barriers based on gender, race, color, national origin, disability and age." *Id*. § 1228a(b). GEPA also requires the Department to engage in notice-and-comment rulemaking when enacting regulations, including new interpretations, that impact Education grant programs. *Id.* § 1232(a), (d).

The FSCS statute authorizes funding for multi-year projects based on Department-approved performance measures. Congress created the FSCS program to direct federal funds to "significantly improve the academic and development outcomes of children living in the most distressed communities" and improve "the effectiveness of services for children and families, particularly for children attending high-poverty schools, including high-poverty rural schools." *Id*. § 7271. The Department may approve FSCS projects for up to 5 years and extend them up to 7 years, funded one year at a time. *Id*. § 7273(b). Congress requires continuation funding under those extensions to be based on a grantee's progress towards "annual performance objectives and

outcomes[.]" *Id*. § 7273(c)(2).

The Department's own regulations also require continuation determinations to be based on grantee performance. *See* 34 C.F.R. §§ 75.118, 75.253. Grantees seeking continuation awards "shall submit a performance report" with up-to-date performance and budget information. *Id*. § 75.118. Grantees must then meet the five criteria listed in 34 C.F.R. § 75.253(a). These factors include showing "substantial progress" towards performance targets, submitting progress and budget reports, and maintaining administrative systems necessary to run the project. *Id*. § 75.253(a)(1)–(4). Grantees must also "[r]eceive a determination from the Secretary that continuation of the project is in the best interest of the Federal Government." *Id*. § 75.253(a)(5). "In determining whether" these factors are met, "the Secretary may consider any relevant information *regarding grantee performance*." *Id*. § 75.253(b) (emphasis added). Non-continuations are allowed only if these criteria are unmet. *Id*. § 75.253(f)(1).

The Department's regulations also shape the relationship between the Department and multi-year grantees. For example, the Department must prioritize continuation awards over new grants. *Id*. § 75.253(c), (e). "If the Secretary decides not to make a continuation award," the regulations continue, "the Secretary will notify the grantee of that decision, the grounds on which it is based, and provide the grantee with an opportunity to request reconsideration." *Id*. § 75.253(g).

This legal framework is designed to ensure that the Department administers FSCS grants using transparent criteria, reliable processes, and performance-based standards rather than ad hoc, undisclosed, or unlawful considerations. It also prevents programs established through significant effort, at public expense, from being upended for arbitrary or unlawful reasons.

In 2023, under these standards, Plaintiffs applied for and were awarded two Full-Service

Community School grants. 2023 Grant Award Letters, Dkt. 3, Ex. 5. The Department approved projects designed to operate for five years and awarded Plaintiffs an initial year of funding, with continuation awards to be determined separately in each of the following four years pursuant to the review process described in 34 C.F.R. § 75.253. *Id*.

Plaintiffs documented significant progress towards their program objectives in their first two years, supporting more than 19,000 Illinois students and families with wide-ranging, community-driven services such as tutoring, transportation, health care, food pantries, school safety, and more. *See* Stanton Decl., Ex.1, ¶¶ 27, 31–32; Guilmette Decl., Ex.4, ¶¶ 5–8, 13. Plaintiffs have complied with all applicable requirements; the Department never notified Plaintiffs of any noncompliance. Plaintiffs received continuation funding in 2025. Grant Award Notifications, Dkt. 3, Ex. 6.

### C. The Department's Discontinuations & Denials of Reconsideration

Starting in early 2025, the new Administration acted quickly to abolish any efforts to advance diversity, equity, and inclusion. In January, the President ordered agencies to terminate "illegal DEI" programs throughout the Federal Government. Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025). The Department trumpeted its compliance, "tak[ing] action to eliminate harmful [DEI] initiatives" and "review[ing] all agency programs and services . . . that may be advancing a divisive DEI agenda. . ." U.S. DEP'T OF EDUC., *U.S. Department of Education Takes Action to Eliminate DEI,* Press Release (Jan. 23, 2025).[1] In February 2025, the Department issued a Directive on Department Grant Priorities instructing Department personnel to conduct an internal review of new and existing grants awarded to ensure "that Department grants do not fund discriminatory practices—including in the form of DEI—that are either

---

[1] https://www.ed.gov/about/news/press-release/us-department-of-education-takes-action-eliminate-dei.

contrary to law or to the Department's policy objectives…" Ex. 22. In July, the Attorney General released "guidance" portraying "DEI" and "equity" as euphemistic labels hiding "discriminatory practices." Memo. from Att'y Gen. to All Federal Agencies, *Re: Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination* (July 29, 2025).[2] In August, citing "problematic" grants funding "diversity, equity, and inclusion and other far-left initiatives," the President ordered all agencies to "review discretionary grants to ensure that they are consistent with agency priorities and the national interest." Exec. Order No. 14332, 90 Fed. Reg. 38929 (Aug. 7, 2025).

Last December, less than three weeks before the end of the 2025 budget period, the Department issued Notices of Non-Continuation to nineteen grantees, including Plaintiffs.[3] The Notices asserted without explanation that Plaintiffs' programs "conflict with [the priorities and policy preferences] of the current Administration," and are "therefore, inconsistent with, and no longer effectuate[], the best interest of the Federal government." Dkt. 3, Ex. 7.

Until 2025, the Department had never discontinued grants solely based on a "best interest" standard. Decl. of Ron Petracca, Dkt. 3, Ex. 3. The Notices do not acknowledge this change. *Id*., Ex. 7. Nor do they explain how Plaintiffs' programs conflict with agency priorities, instead listing a menu of reasons disconnected from Plaintiffs' programs. *Id*. Indeed, the Notices do not describe *any* of Plaintiffs' grant activities. They cite only Plaintiffs' 2023 applications, in which ACT Now described its mission and proposed FSCS activities.

The Department based its discontinuations solely on a handful of sentences plucked from Plaintiffs' 100+ page applications. *Id*. One Notice, discontinuing Plaintiffs' rural FSCS grant,

---

[2] https://www.justice.gov/ag/media/1409486/dl.
[3] *See* Mark Lieberman, *Educator Layoffs Loom as Canceled Community School Grants Remain in Limbo*, EDUCATION WEEK (Jan. 6, 2026), https://www.edweek.org/policy-politics/educator-layoffs-loom-as-canceled-community-schools-grants-remain-in-limbo/2026/01.

flagged the statement that "ACT Now's mission has equity and racial justice at its core," and a brief description of ACT Now's values. *Id*. Another cited passage stated that ACT Now "has access to a variety of partners and content experts that develop curriculum focused on inclusion." *Id*. Another flagged passage stated that "ACT Now will also ensure equitable access to the resources and trainings we create to support community schools" and "[a]ll of our trainings are developed with a racial equity and cultural competency lens." *Id*. In the Notice discontinuing Plaintiffs' urban FSCS grant, the Department cited language stating that ACT Now would consider factors like poverty, race, and ethnicity "to ensure the equitable distribution of funds to school districts." *Id*. These statements, of course, can speak only to what the Plaintiffs proposed and the Department approved in 2023, not the activities Plaintiffs ultimately implemented and have reported on since. *Id*.

In addition to ACT Now, seventeen other grants were similarly summarily discontinued. Their Notices of Non-Continuation contained the same boilerplate justifications as Plaintiffs', citing only language from the applications without any explanation of how any excerpt conflicts with any current Administration priority or policy preference. *See*, *e.g.*, Exs. 24, 26, 28, 30, 32, 34, 36, 38, 40, 42, 44. As with Plaintiffs' Notices, no performance issues were identified.

Plaintiffs requested reconsideration within the seven days the Department allowed.[4] Plaintiffs denied any conflict with Administration priorities, provided supporting evidence, and noted that the applications alone cannot support non-continuations because they cannot speak to grantee performance. Plaintiffs further explained that the specific language the Department flagged described Plaintiffs' values, programs conducted before the grant, programs not conducted at all, or statutorily mandated statements addressing equitable barriers to participating

---

[4] Had the Department terminated the grants rather than discontinue them, the governing regulations would have given Plaintiffs 30 days to appeal. 2 C.F.R. § 200.340(c).

in federally funded education programs. Plaintiffs' requests for reconsideration made clear that the application language cited by the Department did not represent any actual grant activities. Requests for Reconsideration, Dkt. 3, Ex. 8.

Over three business days spanning holiday office closures, the Department purported to conduct its six-step review of Plaintiffs' requests for reconsideration. This process is supposed to include program staff summarizing the requests and additional evidence, multiple officials reviewing those summaries, and a decision-making hierarchy including senior Department leadership producing letters containing "an individualized reconsideration determination with an explanation for the decision." *Department Grant Discontinuation and Termination Processes*, U.S. DEP'T OF EDUC., https://www.ed.gov/grants-and-programs/manage-your-grant/department-grant-discontinuation-and-termination-processes (last visited Apr. 30, 2026). The Department estimates that this process takes approximately 14 working hours per grant and requires the review of a program staff member, their supervisor, and the program attorney.[5]

In record time, with no explanation, the Department denied both requests. The Denial Letters neither addressed Plaintiffs' evidence nor explained the Department's sole reliance on their applications. Instead, the Department merely asserted that "the information in your request for reconsideration was not sufficient" to refute its earlier "findings." Denials of Requests for Reconsideration, Dkt. 3, Ex. 23. The Department, however, did add new excerpts from Plaintiff's applications in further purported support of non-continuation, denying Plainitffs any chance to respond. *Compare* Dkt. 3, Ex. 23 *with* Dkt. 3, Ex. 7. The Department simultaneously issued

---

[5] *See* Final Regulations, Education Department General Administrative Regulations and Related Regulatory Provisions, 89 Fed. Reg. 70316 (Aug. 29, 2024). This same notice also estimates it would take a grantee approximately 24 working hours to draft a request for reconsideration, making the 7-day deadline by the Department to request reconsideration for two non-continuations all the more unreasonable.

similar boilerplate denials of requests for reconsideration to the other seventeen non-continued grants, failing to address evidence and adding new excerpts from the original grant applications. *See*, *e.g.*, Exs. 25, 27, 29, 31, 33, 35, 37, 39, 41, 43, 45. All of this took place with just two days before funding expired.

### III.     LEGAL STANDARD

To obtain a preliminary injunction, Plaintiffs must establish that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Bevis v. City of Naperville, Ill.*, 85 F.4th 1175, 1188 (7th Cir. 2023) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The first two factors are the most important, and the last two merge when Plaintiffs seek relief from government action. *Id.* (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)).

### IV.     ARGUMENT

ACT Now needs preliminary relief to avoid the collapse of its programs, its network, and itself while the Court considers its claims. Plaintiffs are likely to establish that the Department unlawfully discontinued Plaintiffs' grants based on reasons other than Plaintiffs' performance— the sole consideration allowed under the regulations. Absent relief, ACT Now's ongoing harms will culminate in shuttering their operations after June 30. The equities and the public interest also support maintaining these critical programs while Plaintiffs' claims are adjudicated.

#### A.  Plaintiffs are Likely to Succeed on the Merits

Plaintiffs need only establish likelihood of success on any one of the eight counts alleged in their Complaint. Under 34 C.F.R. § 75.253(a)(5), a grantee seeking a continuation award must receive a determination from the Secretary "that continuation of the project is in the best interest of the Federal Government." Although the regulation does not define this phrase, courts have

consistently rejected the Department's claim that it grants the Secretary unlimited, unreviewable discretion to discontinue grants. Instead, courts have held that the "best interest" determination remains fully subject to APA review, is cabined by the regulatory text and structure of § 75.253, must be grounded in performance-related information, and cannot be used to apply policy changes retroactively without notice-and-comment rulemaking. The Department's actions also violate the Constitution. This Court should follow this precedent and reject the Department's invitation to disregard the legal framework governing the Department's decisions.

### 1. The Department Violated the Administrative Procedure Act

Under the Administrative Procedure Act, the court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D). Courts reviewing agency action will uphold the action only if "the agency considered all of the relevant factors and [the court] can discern a rational basis for the agency's choice." *Boucher v. U.S. Dep't of Agric.*, 934 F.3d 530, 547 (7th Cir. 2019) (citation modified) (quoting *Israel v. U.S. Dep't of Agric.*, 282 F.3d 521, 526 (7th Cir. 2002)). An agency that fails to provide a rational explanation for its action connecting the facts found to the choice made violates the APA. *Id.*

### a. The Department Acted Contrary to Law by Violating Its Own Regulations

When the Department non-continued Plaintiffs' projects for 2026 based solely on their 2023 applications, it abused its discretion and acted contrary to law. 5 U.S.C. § 706(2)(A).

Under the APA, agency action is contrary to law when the agency acts in a manner inconsistent with its governing statute and regulations. *See Boucher*, 934 F.3d at 547. As discussed *supra*, the Department's own regulations require the Secretary to determine continuation awards based on "any relevant information regarding grantee performance."

34 C.F.R. § 75.253(b); *see also Washington v. U.S. Dep't of Educ.*, 813 F. Supp. 3d 1222, 1244 (W.D. Wash. 2025) (rejecting Department's interpretation of § 75.253 as allowing the Secretary to consider non-performance-based information), *stay denied,* 167 F.4th 1241 (9th Cir. 2025). When grantees meet all the requirements of § 75.253(a)(1)–(4) the Secretary must determine whether continuation, *based on the grantee's performance to date*, is in the "best interest of the Federal Government." § 75.253(a)(5).

Here, the Department ignored these standards and relied exclusively on materials that are irrelevant to Plaintiffs' actual performance. The Notices state only that the Secretary determined continuation was not in the "best interest of the Federal Government" under § 75.253(a)(5), with no mention of (a)(1)–(4) or (b)'s requirement that performance be considered. The Notices make no mention of Plaintiffs' submissions since 2023, replete with current information about Plaintiffs' infrastructure, partnerships, and services. Stanton Decl., Ex. 1, ¶¶ 19–22, 31. Indeed, the Department's exclusive reliance on Plaintiffs' applications, which cannot speak to Plaintiffs' subsequent grant performance, further forecloses any performance-based rationale for non-continuation. By failing to consider the relevant factors, the Department violated the APA.

**b. The Department Acted Contrary to Law by Creating an "Anti-DEI" Standard Without Notice and Comment**

The Department's non-continuations affect a change in the Department's continuation-award policies, acting contrary to law and required procedure. 5 U.S.C. § 706(2)(A), (D).

Agencies changing policy must follow the notice, explanation, or procedural protections the APA requires. *See generally* 5 U.S.C. § 553 (notice-and-comment rulemaking). Congress directly applies this command to the Department via GEPA, requiring notice and comment for new regulations, including "any generally applicable . . . interpretation", that "has legally binding effect in connection with, or affecting, the provision of financial assistance." 20 U.S.C.

§ 1232(a), (d). Agencies must explain when their actions reflect policy changes: they may not "depart from a prior policy *sub silento* or simply disregard rules that are still on the books." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (citing *United States v. Nixon*, 418 U.S. 683, 696 (1974)).

When interpreting regulations, courts apply the same core principles as with statutes. *See Exelon Generation Co. v. Local 15, Int'l Bhd. of Elec. Workers, AFL-CIO*, 676 F.3d 566, 570 (7th Cir. 2012). Courts may defer to agencies' interpretations only after exhausting all traditional tools of construction, lest an agency "under the guise of interpreting a regulation . . . create *de facto* a new regulation." *Kisor v. Wilkie,* 588 U.S. 558, 575 (2019) (quoting *Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000)). Like statutes, regulations should be read such that "no clause, sentence, or word shall be superfluous, void, or insignificant." *Young v. United Parcel Service, Inc.*, 575 U.S. 206, 226 (2015).

Denying continuation based on application language that the Department now finds objectionable is a change in policy the Department failed to explain. For at least 45 years, the Department *never* discontinued a grant based solely on application language or the "best interest" standard alone. Petracca Decl., Dkt. 3, Ex. 3, ⁋ 6. The Defendants' failure to acknowledge this change in policy, let alone explain it, renders Plaintiffs' discontinuations on this basis unlawful. *FCC*, 556 U.S at 515.

Instead, by newly interpreting the "best interest" standard as a grant of unfettered discretion, the Secretary vitiated the regulatory scheme. Reading the last of a series of performance-based requirements this way effectively nullifies the regulatory framework the Department enacted via rulemaking. *See Washington,* 813 F. Supp. 3d at 1242 ("[N]othing in the existing regulatory scheme comports with the Department's view that multi-year grants may be

discontinued whenever the political will to do so arises."). If the Secretary can ignore performance measures based on Department-approved project objectives and grantee compliance with reporting requirements to deny continuation solely by invoking the "best interest" standard, the detailed regulatory framework governing multi-year awards would be rendered meaningless. *Cf. City of Chicago v. Barr*, 961 F.3d 882, 894 (7th Cir. 2020) (declining to read "a clause in a catch-all provision at the end of a list of explicit powers" to contain "a sweeping power to impose *any* conditions on *any* grants" (emphasis in original) (quoting *City of Chicago v. Sessions*, 888 F.3d 272, 285–87 (7th Cir. 2018)).

Moreover, the Secretary's retroactive application of this change threatens the workability of multi-year awards. "[P]ractical considerations related to the administration of federal grant programs imply that obligations generally should be determined by reference to the law in effect when the grants were made." *Bennett v. New Jersey*, 470 U.S. 632, 640 (1985). And Congress intended FSCS awards for periods that necessarily span multiple administrations. 20 U.S.C. § 7273(b). Allowing the Secretary to invoke the "best interest" standard to displace the standards that governed when the Department awarded Plaintiffs' grants effectively conditions awards not on grantees' performance, but on alignment with unknowable future policy preferences.

Read in context, the "best interest" standard for continuation awards clearly requires assessing grantee performance. *Washington*, 813 F. Supp. 3d at 1243 ("With the history, context, and purpose of the continuation regulation in mind, the Court interprets subsection (b)'s reference to 'any other relevant information' to refer to 'items akin to those specifically enumerated'—namely the required performance, fiscal, and management reports—under the rule of *ejusdem generis*."). The APA prohibits the Secretary's non-continuations by fiat. *Bd. of Educ. of City Sch. Dist. of City of New York v. U.S. Dep't of Educ.*, No. 1:25-08547, 2026

WL 948205, at *7, 10 (S.D.N.Y. Apr. 8, 2026) (permanently enjoining the Department's "best interest"-based non-continuations under the APA).

### c. The Department Exceeded its Authority by Penalizing Compliance with Statutory Mandates

When the Department non-continued Plaintiffs' grants because they addressed potential equitable barriers to their programs, as mandated by statute, it acted contrary to law and exceeded its statutory authority. 5 U.S.C. § 706(2)(A), (C).

"[T]o assist the Department in implementing the Department's mission to ensure equal access to education and to promote educational excellence throughout the Nation," Congress requires that applicants for federal education funds describe steps to mitigate "equitable barriers to participation," including barriers related to poverty, race, and ethnicity. 20 U.S.C. § 1228a(a), (b). Plaintiffs complied with that mandate, which the Department then cited, two years into the program period, as support for non-continuation. *See* Notices, Ex. 16; Denial Letters, Ex. 23.

The Department's action plainly exceeded its statutory authority. The Secretary "has no power to act" outside the bounds laid by statute. *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). Statutes requiring applicants to consider equitable barriers and tying that consideration to the Department's mission to "promote educational excellence" (20 U.S.C. § 1228a(a), (b)) preclude finding that such consideration is not in the best interest of the federal government. By treating congressionally mandated application language as evidence that Plaintiffs' programs are not in the government's best interest, the Department acted contrary to law and exceeded its statutory authority. 5 U.S.C.§ 706(2)(A),

### d. The Department's Actions Were Arbitrary and Capricious

Under the APA, an agency action is "arbitrary and capricious" if it "relied on factors which Congress has not intended it to consider." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut.*

*Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Courts ask whether an agency "examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 567 (2025) (citing *State Farm*, 463 U.S. at 43).

The Department failed to explain how or whether Plaintiffs' grant programs conflict with current agency priorities. The Notices provide four potential bases, but never explain which, if any, apply to which of Plaintiffs' programs, if any.[6] Other courts have held that this exact language is a "complete lack of explanation" under the APA. *Washington*, 807 F. Supp. 3d at 1239 n.6. Compounding this harm, the Denial Letters did not address Plaintiffs' information in their requests for reconsideration that their programs were entirely consistent with administration priorities. The Department merely asserted without explanation that "the information in your request for reconsideration was not sufficient to refute these findings," Denial Letters, Ex. 23, rendering Plaintiffs' right to reconsideration under § 75.253(g) illusory. The Department left Plaintiffs "compelled to guess at the theory underlying the agency's action." *SEC v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947). No post-hoc rationalizations can save these arbitrary and capricious actions. *Boucher*, 934 F.3d at 547 ("[S]upplying a reasoned basis for the agency's action that the agency itself has not given . . . would render judicial review generally meaningless.") (citation modified)).

The Department also never considered Plaintiffs' actual activities or performance under the grants, and so did not find facts that could support discontinuing the grants. Despite having

---

[6] Per the Notices, Plaintiffs' programs conflict with Administration priorities "in that [they]: [1] violate the letter or purpose of Federal civil rights law; [2] conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; [3] undermine the well-being of the students these programs are intended to help; *or* [4] constitute an inappropriate use of federal funds." Dkt. 3, Ex. 7 (emphasis added).

two years' worth of Plaintiffs' reports at its disposal, the Department cited only Plaintiffs' 2023 applications: documents that necessarily lack any information about the programs Plaintiffs have operated since. Because the Department failed to identify any facts that could support its stated basis for discontinuation, its actions were arbitrary and capricious. *State Farm*, 463 U.S. at 42–43.

### 2. The Department Violated the Constitution

### a. The Department Violated the Separation of Powers and Spending Clause

The Executive Branch's imposition of its own conditions on federal funds appropriated by Congress to effectuate its own policy goals "strikes at the heart . . .of the separation of powers." *City of Chicago*, 961 F.3d at 892. The Constitution empowers Congress, and only Congress, to appropriate and place conditions on public funds for the general welfare. U.S. CONST. art. I, § 8, cl. 1; *id.*, § 9, cl. 7; *see also OPM v. Richmond*, 496 U.S. 414, 427–28 (1990) (The Appropriations Clause has a "fundamental and comprehensive purpose. . . to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents."). Enforcing the separation of powers protects the public from Executive Branch officials "determined to impose [their] policy preferences regardless of the will of Congress." *City of Chicago*, 961 F.3d at 892.

Congress has not authorized the Department to deny a continuation award based on a grantee's DEI initiatives. To the contrary, Congress explicitly *requires* such initiatives under GEPA. The Department cannot now hold against Plaintiffs their compliance with Congress' directive to "describe in [their] application" the ways in which the program "ensure[s] equitable access" regardless of "gender, race, color, national origin, disability, and age." 20 U.S.C.

§ 1228a(b). The separation of powers does not allow the Executive to supplant Congress' conditions with its own, and this Court should not allow it either. *See Cnty. of Santa Clara v. Noem*, 815 F. Supp. 3d 979, 1026 (N.D. Cal. 2025) (holding that plaintiffs "have a strong claim" at preliminary injunction stage that DHS grant conditions prohibiting promotion of DEI violates separation of powers "by contravening Congress's clear intent in passing the relevant programs").

Relatedly, under the Spending Clause, "Congress, under its spending power, can attach only conditions that 'bear some relationship to the purpose of the federal spending.'" *City of Chicago,* 961 F.3d at 908 (citing *New York v. United States,* 505 U.S. 144, 167 (1992)). Any conditions on federal funds must be stated unambiguously and provide clear notice. *See Pennhurst State School and Hosp. v. Halderman*, 451 U.S. 1, 17–25 (1981). Congress' spending power is broad, but "it does not include surprising [funding recipients] with . . . 'retroactive' conditions." *Id*. at 25.

The Department's non-continuations cannot be reconciled with Congress's directive to base FSCS continuation funding on "annual performance objectives and outcomes" such as academic achievements and number of families served. 20 U.S.C. § 7275(a)(4)(C). Conditioning funding on these metrics makes sense given the goals of the FSCS program. Nowhere in statute does Congress indicate that the Department may condition continued funding for five-year projects, necessarily spanning administrations, based on ideological alignment with the current occupants of the Executive Branch. As such, the Department's actions are unconstitutional.

### b. The "Best Interest" Standard as Applied Is Unconstitutionally Vague

A regulation is void for vagueness under the Fifth Amendment's Due Process Clause if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so

standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).[7] It is a "fundamental principle in our legal system. . . that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

Here, the Department's application of the "best interest" standard is impermissibly vague. Although no regulation further defines what constitutes the Federal Government's "best interest," 34 C.F.R. § 75.253(a)(5), the following subsection limits the scope of information that may be considered to that "regarding grantee performance." 34 C.F.R. § 75.253(b). Such information "includes reports required by § 75.118, performance measures established under § 75.110, financial information required by 2 CFR part 200, and any other relevant information." *Id*. The catchall clause "any other relevant information" must be interpreted as information of the same type, *i.e*., grantee performance. *See Citizens Ins. Co. v. Wynndalco Enters., LLC*, 70 F.4th 987, 998–99 (7th Cir. 2023) (explaining *ejusdem generis* canon of construction); *accord Washington*, 813 F. Supp. 3d at 1243 (applying *ejusdem generis* to 34 C.F.R. § 75.253(b)).

The Department's interpretation of the "best interest" standard to allow discontinuation based on new agency efforts to eradicate DEI violates these principles. When Plaintiffs applied for the FSCS grants in 2023, they could not have known that the Federal Government would interpret "best interest" to mean gutting funding to organizations whose applications discuss inclusion and equity. *See Rhode Island Coal. Against Domestic Violence v. Kennedy*, 812 F. Supp. 3d. 180, 197 (D.R.I. 2025) (finding that new grant conditions requiring grantees to refrain from "promoting gender ideology" were unconstitutionally vague because they did not define those terms).

---

[7] The same void-for-vagueness principles that apply to statutes also apply to regulations. *See Midwest Fence Corp. v. U.S. Dep't of Transp.*, 840 F.3d 932, 947 (7th Cir. 2016).

The Department's interpretation also provides no discernable enforcement standard and subjected Plaintiffs to arbitrary enforcement. Thus, the Department's reliance on "best interest of the Federal Government," as applied to Plaintiffs, is impermissibly vague.

### c. The Department Violated Plaintiffs' Right to Due Process

The Department's actions deprive Plaintiffs of fair notice and a meaningful opportunity to be heard before the loss of federal grant funding. Even where the government retains discretion in a final determination, "[a] person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit." *Perry v. Sindermann*, 408 U.S. 593, 601 (1972). The detailed statutory and regulatory framework governing multi-year awards, the Department's longstanding practice of basing continuation awards on performance, and the Plaintiffs' 2025 continuation awards created reasonable expectations that the Department would continue assessing Plaintiffs accordingly.

The Department issued the Notices only nineteen days before the close of Plaintiffs' budget period, giving Plaintiffs no notice of non-compliance and virtually no time to plan for a sudden loss of funding. Those Notices, as discussed *supra*, failed to explain "the grounds on which" the decisions were based as required by 34 C.F.R. § 75.253(g). And the Denial Letters, received just two days before the close of the budget period, did not even attempt to engage with Plaintiffs' "basis for disagreeing with the Secretary's decision . . . [or their] relevant supporting documentation." 34 C.F.R. § 75.253(g)(1)(ii). The compressed timeline for reconsideration made it impossible for the Secretary to "consider the request for reconsideration," 34 C.F.R. § 75.253(g)(2), in any meaningful sense. *See also* Petracca Decl., Dkt. 3, Ex. 3, ¶ 30 (describing how the timing of the non-continuations gave "an understaffed Department one and a half weeks, during year-end holidays, to consider multiple requests for reconsideration covering significant

20

and complex programs."). Accordingly, the Department denied Plaintiffs the notice and process that the Fifth Amendment requires.

### d. The Department Violated Plaintiffs' Right to Free Speech

The First Amendment prohibits government officials from retaliating against individuals or entities for engaging in protected speech. *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019). To establish a claim of retaliation, a plaintiff must establish that "(1) it engaged in activity protected by the First Amendment, (2) it suffered a deprivation that would likely deter First Amendment activity in the future, and (3) the First Amendment activity was a "at least a motivating factor" in the Defendants' decision to take the retaliatory action." *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008) (quoting *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006)).

Those elements are satisfied here. In the Notices and Denial Letters, the Department cited Plaintiffs' statements expressing its values and mission as evidence that continuation funding was not in the "best interest of the Federal Government." Notices, Dkt. 3, Ex. 7; Denial Letters, Dkt. 3, Ex. 23. The Department deprived Plaintiffs of meaningful continuation review not for what they did with federal funds, but for expressing commitments to equity and racial justice that conflict with its current priorities. The Department's conduct here is certain to deter similar statements in the future. Targeting Plaintiffs because of their views makes this "egregious" violation "all the more blatant." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995).

The Department's actions also violate the unconstitutional conditions doctrine, which "prevents the government from awarding or withholding a public benefit for the purpose of coercing the beneficiary to give up a constitutional right or to penalize his exercise of a constitutional right." *Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't of Health*, 699 F.3d 962, 986 (7th Cir. 2012). The Department's actions suggest that not expressing

disfavored viewpoints would support continuation. This is unconstitutional even if Plaintiffs were not entitled to continuation. "[T]he government may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit." *Rumsfeld v. Forum for Acad. and Inst. Rights, Inc.,* 547 U.S. 47, 59 (2006) (quoting *United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 210 (2003)).

### B.  Plaintiffs Will Suffer Irreparable Harm Absent Immediate Relief

Irreparable harm exists where an injury is likely and imminent and cannot be remedied by legal relief after the fact. *Winter*, 555 U.S. at 22; *DM Trans, LLC v. Scott*, 38 F.4th 608, 618 (7th Cir. 2022). Inadequate remedy at law does not mean wholly ineffectual; rather, the remedy "must be seriously deficient as compared to the harm suffered." *DM Trans*, 38 F.4th at 618 (citing *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021)). That standard is easily met here.

The Department's unlawful non-continuation decision will terminate all funding on June 30, following the expiration of the temporary agreement on the use of carry-over funding. That will force the immediate shutdown of Plaintiffs' FSCS-funded programs and causing cascading harms that cannot be remedied through subsequent relief. Plaintiffs will be forced to cease all FSCS operations, unwind contracts, terminate staff, and halt reimbursements of newly incurred expenses to partner schools and community organizations. Stanton Decl., Ex. 1, ¶ 41; Rivers Decl., Ex. 2, ¶ 15; Long Decl., Ex. 3, ¶ 11. Because school programs operate on a reimbursement basis, schools and community partners cannot lawfully continue services without assurance of reimbursement, and thus must immediately cease operations. Stanton Decl., Ex. 1, ¶ 30. Furthermore, without a substantial likelihood of future funding, the school budget process and cycle for partner districts will preclude continuation of FSCS programs and result in termination of staff and contracts with partner organizations. Stanton Decl., Ex. 1, ¶¶ 34–36; Rivers Decl.,

Ex. 2, ¶¶ 10–11, 13; Hosfeldt Decl., Ex. 6, ¶¶ 20–21; Decl. of Kristina Davis, Ex. 7, ¶¶ 6–9; Decl. of Diana Rea, Ex. 8, ¶ 19; Decl. of Thomas Edgar, Ex. 13, ¶¶ 11–13; Decl. of Michelle Lamboley, Ex. 14, ¶¶ 14–17; Decl. of Larry Lovel, Ex. 9, ¶¶ 16–17; Decl. of Kathryn Jennings, Ex. 10, ¶ 13; Decl. of Jean Neal, Ex. 12, ¶¶ 9–12; Decl. of Rebecca Kinsey, Ex. 21, ¶¶ 33–39.

As of December 2025, over 19,000 Illinois students benefited from ACT Now's programs and services. Within school, these supports include tutoring, early childhood enrichment, classroom supports and equipment, mental and behavioral health supports, on-campus dental, vision, and medical screenings and treatment, meals, and programs geared toward supporting students in college and career readiness. *See* Stanton Decl., Ex. 1, ¶ 28; Rivers Decl., Ex. 2, ¶ 9; *descriptions of locally-responsive in-school services provided*: Decl. of Meredith Williams, Ex. 5, ¶¶ 7–8, 10; Hosfeldt Decl., Ex. 6, ¶ 11; Davis Decl., Ex. 7, ¶ 4; Rea Decl., Ex. 8, ¶¶ 8–9; Edgar Decl., Ex. 7, ¶ 7; Lamboley Decl., Ex. 14, ¶¶ 6–7, 10–13; Lovel Decl., Ex. 9, ¶¶ 13–14; Jennings Decl., Ex. 10, ¶¶ 7, 9; Decl. of Josh Pietrantoni, Ex. 11, ¶¶ 6, 12–13; Neal Decl., Ex. 12, ¶¶ 5–7; Kinsey Decl., Ex. 21, ¶¶ 16, 22–23, 26; Decl. of Kimberly David, Ex. 20, ¶¶ 8, 11; Decl. of Kendra O'Connell, Ex. 19, ¶ 6; Stigge-Kaufman Decl., Ex. 17, ¶¶ 10–15; Decl. of Valerie Clodi, Ex. 16, ¶¶ 10–11, 15; and Decl. of Amy Vogt, Ex. 15, ¶¶ 10, 12–15.

Outside of school, ACT Now grants provide critically necessary after-school and wrap-around care, field trips and extracurricular activities and experiences, community-building family nights and programming, and vital support services to families, including food pantries, assistance with crisis housing and utility needs, access to laundry and clothing, social services, and career and financial training. *See* Rivers Decl., Ex. 2, ¶ 9; Guilmette Decl., Ex. 4, ¶ 8; *descriptions of locally-responsive out-of-school services provided*: Williams Decl., Ex. 5, ¶ 9; Hosfeldt Decl., Ex. 6, ¶ 11; Davis Decl., Ex. 7, ¶ 4; Rea Decl., Ex. 8, ¶¶ 10–15; Edgar Decl.,

Ex. 13, ¶¶ 5–6, 8–10; Lamboley Decl., Ex. 14, ¶ 8; Lovel Decl., Ex. 9, ¶¶ 13–14; Jennings Decl., Ex. 10, ¶¶ 7–8; Pietrantoni Decl., Ex. 11, ¶¶ 7–11; Neal Decl., Ex. 12, ¶¶ 5–7; Kinsey Decl., Ex. 21, ¶¶ 17–19, 20–22, 24–25, 37; David Decl., Ex. 20, ¶¶ 8–9, 12–13; O'Connell Decl., Ex. 19, ¶¶ 6–7, 10–14, 16–17; Stigge-Kaufman Decl., Ex. 17, ¶¶ 10–15; Clodi Decl., Ex. 16, ¶¶ 7, 9, 12–13; Vogt Decl., Ex. 15, ¶¶ 10–13, 15.

The Department's unlawful and abrupt discontinuation of Plaintiffs' Full-Service Community Schools grants, even with restricted access to a per-diem allowance of Plaintiff's carry-over funds, has already upended critical and life-saving programs that serve thousands of students and families across Illinois, resulting in direct impacts to students, as well as significant program and job losses. *See* Stanton Decl., Ex. 1, ¶¶ 30, 33–38; Rivers Decl., Ex. 2, ¶¶ 10, 12, 17; Decl. of Aaminah Long, Ex. 3, ¶¶ 5–10; Guilmette Decl., Ex. 4, ¶¶ 9, 15–16; Williams Decl., Ex. 5, ¶¶ 12–15; Hosfeldt Decl., Ex. 6, ¶¶ 14–21; Davis Decl., Ex. 7, ¶¶ 4, 6–9; Rea Decl., Ex. 8, ¶¶ 16–18; Edgar Decl., Ex. 13, ¶¶ 5–10; Lovel Decl., Ex. 9, ¶¶ 5–12; Jennings Decl., Ex. 10, ¶¶ 10–11; Pietrantoni Decl., Ex. 11, ¶¶ 7, 8, 10, 15; Neal Decl., Ex. 12, ¶¶ 5–6; Kinsey Decl., Ex. 21, ¶¶ 28–30; David Decl., Ex. 20, ¶¶ 15–18; Decl. of Rachel Mateyka, Ex. 18, ¶¶ 5–6; Stigge-Kaufman Decl., Ex. 17, ¶¶ 20–21, 23–25; Clodi Decl., Ex. 16, ¶¶ 7, 18–22; Vogt Decl., Ex. 15, ¶¶ 16–17.

If access to funds is lost on June 30, the results will be disastrous and irreparable to the thousands of vulnerable students the FSCS grant program was designed to serve. Schools and community partners will immediately shutter programs and terminate staff. Stanton Decl., Ex. 1, ¶ 41; Long Decl., Ex. 3, ¶ 11, Hosfeldt Decl., Ex. 6, ¶ 18; Davis Decl., Ex. 7, ¶¶ 7–8; Rea Decl., Ex. 8, ¶ 19; Lamboley Decl., Ex. 14, ¶ 15; Lovel Decl., Ex. 9, ¶¶ 16–17; Kinsey Decl., Ex. 21, ¶ 29. The loss of these services will immediately disrupt academic progress, eliminate access to

critical supports, and destabilize schools serving high-need communities. Stanton Decl., Ex. 1, ¶¶ 43–44; Long Decl., Ex. 3, ¶ 11; Rea Decl., Ex. 8, ¶ 19; Lamboley Decl., Ex. 14, ¶¶ 6–7; Lovel Decl., Ex. 9, ¶ 15; Kinsey Decl., Ex. 21, ¶ 41; O'Connell Decl., Ex. 19, ¶¶ 18–19; Stigge-Kaufman Decl., Ex. 17, ¶ 26. Summer camp programs that provide a safe and nurturing environment for children, while allowing their parents and guardians to work, will disappear. Lamboley Decl., Ex. 14, ¶ 15; Kinsey Decl., Ex. 21, ¶ 41. Food pantries and meal supports that provide critical nutrition assistance for students and families throughout the year will disappear, leaving children hungry. Lamboley Decl., Ex. 14, ¶ 8. Students with medical needs and families in housing crisis will lose critical, trusted lines of support. *Id*. at ¶ 8; Pietrantoni Decl., Ex. 11, ¶ 9; Kinsey Decl., Ex. 21, ¶ 41.

This harm extends beyond the immediate loss of services once programs are shut down. Even if funding were later restored, the programs would not simply return to their prior state but would instead need to be rebuilt from the ground up. *Id*. at ¶ 44; Stanton Decl., Ex. 1, ¶ 41; Long Decl., Ex. 3, ¶ 12; Guilmette Decl., Ex. 4, ¶¶ 13–14, 17. Hiring, background checks, training, restoring community networks, and rebuilding service delivery infrastructure would take months or years. Stanton Decl., Ex. 1, ¶¶ 41–42, 44. The loss of funding will cause immediate and irreparable harm to Plaintiffs' organizational capacity. Plaintiff ACT Now receives approximately 96% of their annual operational budget from their FSCS grants. *Id*. at ¶ 40. Without that funding, it will be forced to eliminate core staff positions and cease all FSCS-funded operations. *Id*. Furthermore, it will be forced to eliminate its statewide technical assistance, compliance, and oversight infrastructure, rendering it unable to support subgrantees, manage data and reporting obligations, or coordinate statewide learning networks. *Id*. at ¶¶ 24, 40. In short, ACT Now will be incapable of carrying out its organizational mission.

Losing that organizational capacity will also cause irreparable harm to Plaintiffs' relationships and goodwill. Plaintiffs' grants support long-term, relationship-based partnerships among schools, families, community organizations, and state-level intermediaries. Rivers Decl., Ex. 2, ¶ 16; Long Decl., Ex. 3, ¶ 12; Guilmette Decl., Ex. 4, ¶¶ 18–19; O'Connell Decl., Ex. 19, ¶¶ 8–9, 15; Stigge-Kaufman Decl., Ex. 17, ¶ 18. Abrupt termination will fracture trust with and between school districts, parents, community partners, and students; undermine ACT Now's credibility as a reliable intermediary and faith in the community school model; and permanently damage partnerships that have taken years to build. Stanton Decl., Ex. 1, ¶¶ 37–38, 40, 43; Rivers Decl., Ex. 2, ¶ 16; Long Decl., Ex. 3, ¶ 12; Guilmette Decl., Ex. 4, ¶ 19; Hosfeldt Decl., Ex. 6, ¶¶ 14, 16-17, 19-21; Davis Decl., Ex. 7, ¶¶ 8-9; Jennings Decl., Ex. 10, ¶ 12; Kinsey Decl., Ex. 21, ¶¶ 31–33, 37–40; Stigge-Kaufman Decl., Ex. 17, ¶ 28; Vogt Decl., Ex. 15, ¶¶ 18, 21–23. Courts consistently recognize that the loss of goodwill, reputational injury, and damage to long-standing collaborative relationships constitute irreparable harm because they cannot be easily quantified or repaired after the fact. *DM Trans*, 38 F.4th at 621; *Life Spine*, 8 F.4th at 546.

### C. The Balance of Equities and the Public Interest Strongly Favor Preliminary Relief

The third and fourth of the *Winter* factors, harm to the opposing party and the public interest, merge when the Government is the opposing party. *Nken*, 556 U.S. at 434. Here, the balance of equities and the public interest overwhelmingly favor Plaintiffs.

Discontinuing these programs is directly contrary to the public interest, and the government would suffer no cognizable harm from the requested injunction. The Department has denied 19,000 students tangible—indeed, critical—goods and services based solely on its abstract, political "interest" in taking a public stand against DEI. When Congress authorized the Full-Service Community Schools program, it determined that the public interest required

students living in the country's "most distressed communities" to be given food, clothing, transportation, health care, and safe after-school activities via grants like these. 20 U.S.C. § 7271(1). If this motion is denied, 19,000 students will be deprived of essentials they need to succeed in school—things Congress determined by law they should be given and that only Plaintiffs can provide. The Department has no comparable interest in denying Plaintiffs the ability to operate their programs pending a ruling on the merits.

Preliminarily enjoining the non-continuations would merely preserve the status quo. Restoring Plaintiffs to their status as of December 31, 2025, would restore the non-monetary benefits active grantees receive, Stanton Decl., Ex. 1, ₱ 44, as well as permit Plaintiffs' use of unexpended funds without the restrictions the Department imposed after the non-continuations. U.S. Dep't of Educ., Handbook on Discretionary Grant Awards at 237. In short, an order preventing the immediate dismantling of programs built at considerable public expense while this Court determines the legality of the Department's conduct imposes no meaningful burden on the government and avoids irreversible harm to Plaintiffs, their partners, and the communities they serve. The equities therefore weigh entirely in favor of granting preliminary relief.

## V. CONCLUSION

For these reasons, Plaintiffs respectfully request that the Court grant their request for a Preliminary Injunction.

Dated: April 30, 2026

Respectfully submitted,

/s/ *Jocelyn Skinner*

Jocelyn (Josie) E. Skinner (*pro hac vice*)
Emily K. Merolli (*pro hac vice*)
SLIGO LAW GROUP, PLLC
1717 K St. NW, Suite 900
Washington, DC 20006
Telephone: (202) 888-2084
josie@sligolawgroup.com
emily@sligolawgroup.com


/s/ *Scott C. Solberg*

Scott C. Solberg (No. 6204487)
Alec Solotorovsky (No. 6297666)
Elizabeth M. Hady (No. 6316542)
EIMER STAHL LLP
224 S. Michigan Ave., Suite 1100
Chicago, IL 60604
Telephone: (312) 660-7600
Facsimile: (312) 692-1718
ssolberg@eimerstahl.com
asolotorovsky@eimerstahl.com
ehady@eimerstahl.com

/s/ *Aneel Chablani*

Aneel L. Chablani (No. 6242658)
Beatriz A. Diaz-Pollack (No. 6274809)
Michael R. Ortega (No. 6339469)
CHICAGO LAWYERS' COMMITTEE
FOR CIVIL RIGHTS
25 E. Washington St., Suite 1300
Chicago, IL 60602
Telephone: (312) 630-9744
Facsimile: (312) 630-1127
achablani@clccrul.org
bdiaz-pollack@clccrul.org
mortega@clccrul.org

*Attorneys for Plaintiffs*
*Afterschool for Children and Teens*
*Now (ACT Now) Coalition and*
*Metropolitan Family Services*