**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| AFTERSCHOOL FOR CHILDREN AND TEENS (ACT) NOW and METROPOLITAN FAMILY SERVICES, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF EDUCATION and LINDA MCMAHON, in her official capacity as Secretary, U.S. Department of Education, <br><br> Defendants. | Case No. 1:25-cv-15704 <br><br> Judge Martha M. Pacold |

**MEMORANDUM OPINION AND ORDER**

Defendants' motion to dismiss [28][1] for lack of jurisdiction is granted in part (as to Counts I–VI) and continued in part (as to Counts VII–VIII).

**FACTUAL AND PROCEDURAL BACKGROUND**

Defendants have moved to dismiss under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction. *See* [28] at 1. "A motion to dismiss under Rule 12(b)(1) tests the jurisdictional sufficiency of the complaint, accepting as true all well-pleaded factual allegations and drawing reasonable inferences in favor of the plaintiffs." *Bultasa Buddhist Temple of Chi. v. Nielsen*, 878 F.3d 570, 573 (7th Cir. 2017). The court thus begins by describing plaintiffs' allegations and then moves to addressing whether they are jurisdictionally sufficient.

Plaintiff ACT Now is "a statewide unincorporated organization based in Illinois that," among other goals, "works to expand access to high-quality out-of-school time." [1] ¶ 12. Plaintiff Metropolitan Family Services is "an Illinois nonprofit" which, among other tasks, "holds ACT Now's federal grant awards." *Id.* ¶ 11. Defendants are the Department of Education ("Education"), which is "responsible for

---

[1] Bracketed numbers refer to docket entries and are followed by page and / or paragraph number citations. Page numbers refer to the CM/ECF page number.

administering federal education grant programs," and Linda McMahon, the Secretary of Education. *Id.* ¶¶ 14–15.

Education administers a grant program called the "Full-Service Community Schools (FSCS) program," which "is a discretionary grant program authorized by Title IV." *Id.* ¶ 20 (citing 20 U.S.C. §§ 7271–75). "In addition to the authorizing statute, the FSCS program is governed by the General Education Provisions Act," which, in part, "establish[es] the requirements governing the application process, selection criteria, grant administration, reporting obligations, and continuation funding for multi-year discretionary grants." *Id.* ¶ 24 (citing 20 U.S.C. § 1221 *et seq.*). Once a grant is "awarded, the grant obligates both the Department and the grantee to comply with the terms and conditions of the award." *Id.* ¶ 26 (citing 34 C.F.R. § 75.236).

A few pieces of information about how FSCS grants are structured are relevant. Education "approves grants that span multi-year project periods," but Education only "awards funds for an initial budget period" of about a year. *Id.* ¶ 27. Education then awards funds through "the remainder of the project period through regular continuation awards." *Id.* (citing 34 C.F.R. § 75.251(a)–(b)). "Continuation awards are made," in part, if "the grantee continues to meet multiple, specific regulatory requirements concerning grant performance, financial reporting," and other "requirements." *Id.* (citing 34 C.F.R. §§ 75.118, 75.253(a)(1)–(4)). But those are not the only requirements. Education must also "determine that continuing the project is 'in the best interest of the Federal Government.'" *Id.* (quoting 34 C.F.R. § 75.253(a)(5)). "During the previous 45 years," plaintiffs allege, "non-continuation determinations have been" quite rare and "only tied to significant concerns related to project performance." *Id.* ¶ 29 (quotation omitted).

Plaintiffs were awarded two FSCS grants, the potential remaining value of which is millions of dollars. "Both of [p]laintiffs' FSCS grants were awarded as multi-year discretionary grants with a five-year project period running from January 1, 2024, through December 31, 2028." *Id.* ¶ 34. "The combined total of [p]laintiffs' two" "grants is approximately $18.5 million annually," and "[l]oss of continued funding would eliminate more than $55 million" in grant funding over the remainder of the "grant period." *Id.* ¶ 19.

"On December 12, 2025," Education "issued Notices of Non-Continuation for both grants." *Id.* ¶ 36. "Each Notice stated that [Education] had determined not to continue the award" "because the grants provide[] funding for programs that reflect the prior Administration's priorities and policy preferences and conflict with those of the current Administration." *Id.* (quotation omitted). Education thus determined that "the grants are . . . inconsistent with, and no longer effectuate[], the best interest of the Federal Government." *Id.* (quotation omitted). "The Notices did not identify deficiencies in programmatic performance, fiscal management, or reporting." *Id.* Plaintiffs asked for reconsideration and were denied. *Id.* ¶¶ 37–38.

Finding these decisions to be contrary to law, plaintiffs sued. Counts I–III allege violations of the Administrative Procedure Act, 5 U.S.C. § 551 *et seq*. Count I alleges that Education violated the APA because it "acted arbitrarily and capriciously because the Notices of Non-Continuation and Denial Letters failed to identify any deficiencies in [p]laintiffs' grant performance, compliance, or progress toward approved objectives, as required by" 34 C.F.R. § 75.253(b), and instead "relied on vague and conclusory assertions that continuation was not in the 'best interest of the Federal Government,' without reference to [p]laintiffs' performance reports, grant activities, or other relevant information." [1] ¶¶ 54–55. Plaintiffs also allege that the denial of reconsideration failed to adequately respond to plaintiffs' arguments. *Id.* ¶ 58. Count II alleges that Education "acted contrary to law," thereby violating the APA, because by "interpret[ing] the 'best interest' requirement" in the way that it did, Education "create[d] from whole cloth a de facto second review of approved grant applications for alignment with new, unpublished, and previously undisclosed grant priorities." *Id.* at ¶¶ 67–68. Count III alleges that Education violated the APA by acting "in Excess of Statutory Authority." *Id.* at 18. The General Education Provisions Act "requires every applicant for federal education funds 'to develop and describe in such applicant's application the steps such applicant proposes to take to ensure equitable access to, and equitable participation in, the project or activity to be conducted with'" the funds. *Id.* ¶ 71 (quoting 20 U.S.C. § 1288a). Specifically, that Act requires "addressing" "barriers based on gender, race, color, national origin, disability, and age." *Id.* (quoting 20 U.S.C. § 1288a). Plaintiffs allege that they "complied" with that requirement by stating, among other things, that their "trainings are developed with a racial equity and cultural competency lens"— something Education "cited in the Notices and Denial Letters . . . as a basis for denying continuation funding." *Id.* ¶¶ 72–73 (quotation omitted).

Count IV alleges that Education's actions "violate the Spending Clause," U.S. Const. art. I, § 8, cl. 1, because "they constitute an exercise of" spending "authority not granted to the Executive Branch." [1] ¶ 77. Namely, the Spending Clause "vests" in "Congress" the "authority to determine the terms and conditions under which federal funds are spent." *Id.* ¶ 78. "By conditioning receipt of continuation funding on whether [p]laintiffs' approved applications aligned with the current Administration's political priorities," plaintiffs allege, Education "exceeded the authority delegated to it by Congress, in violation of the Spending Clause." *Id.* ¶ 82.

Counts V–VI allege violations of U.S. Const. amend. V—specifically, its clause prohibiting the "depriv[ation] of . . . liberty" "without due process of law." Count V alleges that Education's "claim that continuation of [p]laintiff's grants was not in the 'best interest of the Federal Government' without providing a clear definition of that term" is void for vagueness as it "invite[d] arbitrary enforcement in violation of the Fifth Amendment[]." [1] ¶¶ 85, 87, 89. Count VI alleges that Education's "actions violated [p]laintiffs' Fifth Amendment rights to procedural due process by depriving them of fair notice and a meaningful opportunity to be heard before the loss of federal grant funding." *Id.* ¶ 92. This is because, plaintiffs allege, the "awarding of

continuation awards" is "based on a detailed statutory and regulatory scheme," and that "framework, together with the longstanding practice of making the decision to award continuation awards on the basis of performance rather than application content, created reasonable procedural expectations that [p]laintiff[s'] continuation award determinations would be made in accordance with these procedures." *Id.* ¶¶ 94–95.

Counts VII–VIII allege violations of U.S. Const. amend. I—specifically, its clause regarding "the freedom of speech." Count VII alleges that Education violated plaintiffs' free speech rights by denying them funding for "expressing their mission, values, and commitments in their grant applications." [1] ¶ 101. This, plaintiffs allege, constituted "penaliz[ing] [p]laintiffs not for what they did with federal funds, but for what they said about their beliefs, values, and experience." *Id.* ¶ 105. Count VIII alleges that Education violated plaintiffs' free speech rights by "conditioning continuation funding on whether [p]laintiffs' previously approved applications align with the current Administration's preferred viewpoints." *Id.* ¶ 112.

As remedies, plaintiffs request several things; the complaint requests roughly the same remedies for all counts. First is a series of requests for declaratory relief:

A. Declare that the Department's issuance of the Notices of Non-Continuation and subsequent Denials of Request for Reconsideration constitutes final agency action that is arbitrary, capricious, contrary to law, and in excess of statutory authority, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A) and (C);

B. Declare that the Department's actions violate the Spending Clause and separation-of-powers principles of the United States Constitution; [and]

C. Declare that the Department's actions violate [p]laintiffs' rights under the First Amendment and the Due Process Clause of the Fifth Amendment[.]

[1] at 25. Next is a set of requests for vacatur and injunctive relief:

D. Vacate and set aside the Notices of Non-Continuation and Denials of Request for Reconsideration issued to [p]laintiffs for its Full-Service Community Schools grants;

E. Order the Department to, consistent with applicable statutes and regulations, review [p]laintiffs' eligibility for a continuation award and, if necessary, to release such funding;

4

F.      Preliminarily and permanently enjoin the Department, its officers, agents, servants, employees, and all persons acting in concert with it from enforcing the challenged Notices of Non-Continuation and Denials of Request for Reconsideration; [and]

G.      Enjoin the Department from denying continuation funding based on extra-statutory, retroactive, or viewpoint-based criteria not authorized by Congress or disclosed through lawful rulemaking[.]

[1] at 26. Plaintiffs also requested a few other things: namely, to retain jurisdiction over the case, award attorneys' fees, and grant other "just and proper" relief. *Id.*

## ANALYSIS

Generally speaking, under the Tucker Act only the Court of Federal Claims ("CFC") has jurisdiction over certain contract claims. This case involves contracts, plaintiffs' FSCS grants, but plaintiffs have brought several claims, none of which are styled as breach of contract. Precedent recognizes, however, that litigants often attempt to dodge the CFC's exclusive jurisdiction by styling contract claims as something else. The court must answer whether that is what plaintiffs have done in this case.

Section I provides a brief overview of the Tucker Act, then discusses what sorts of claims, not styled as breach of contract, are nevertheless within the exclusive purview of the CFC. Section II addresses why the grants at issue in this case are considered "contracts" for purposes of the Tucker Act. Section III analyzes whether plaintiffs' claims must be heard in the CFC, concluding that Counts I–VI are contract claims belonging to the CFC, whereas Counts VII–VIII likely (with some hesitation) belong here.

## I.    Some Claims "Founded . . . Upon" Contract Belong To The CFC

The court begins with two predicate legal points. First, the court provides an overview of the Tucker Act and Little Tucker Act, which route certain contract-based claims to the Court of Federal Claims. Second, the court addresses the Seventh Circuit's test for which claims are "contractual" and thereby fall under the Tucker Act and Little Tucker Act.

### A.    The Tucker Act and Little Tucker Act route to the CFC high-value claims "founded . . . upon" contracts with the United States

"Suits against the United States are 'available by grace and not by right[.]'" *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2662 (2025) (Barrett, J., concurring) (quoting *United States v. Tohono O'Odham Nation*, 563 U.S. 307, 317 (2011)). That is because "[s]overeign immunity shields the United States from suit

5

absent a consent to be sued that is unequivocally expressed." *United States v. Bormes*, 568 U.S. 6, 9 (2012) (quotation omitted). Generally speaking, then, the default is that the United States is immune from suit alleging that it breached its contracts. For a court to have jurisdiction over such a claim, a statute must affirmatively provide it.

The Tucker Act and Little Tucker Act are "jurisdictional provisions that operate to waive sovereign immunity for" contract claims. *Bormes*, 568 U.S. at 10 (quotation omitted). The Tucker Act provides:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States[.]

28 U.S.C. § 1491(a)(1). In other words, the CFC has jurisdiction over all claims founded upon contract against the United States, in part[2] because the Tucker Act has waived the United States' sovereign immunity against such contract claims. By contrast, under the Little Tucker Act, district courts have jurisdiction over just a subset of those contract claims the CFC has jurisdiction over. The Little Tucker Act provides:

> The district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of . . . [a]ny other civil action or claim against the United States, not exceeding $10,000 in amount, founded . . . upon any express or implied contract with the United States[.]

28 U.S.C. § 1346(a)(2).

This statutory scheme yields an important practical result. Unless some other statute waives sovereign immunity for claims seeking over $10,000 founded upon contract with the United States, district courts cannot hear such claims. And as many courts have noted, no such other statute exists. So, the CFC is said to have "exclusive jurisdiction" over claims seeking over $10,000 founded upon contract with the United States. *Chi. Consortium, Inc. v. Brennan*, 599 F.2d 138, 141 (7th Cir. 1979); *accord Atterbury v. U.S. Marshals Serv.*, 805 F.3d 398, 406 (2d Cir. 2015).

But while no other statute waives sovereign immunity for claims founded upon contract with the United States, other statutes, like the APA, waive sovereign immunity for other sorts of claims against the United States. *See, e.g.*, 5 U.S.C. § 702. And this poses a problem: clever lawyers often attempt to "escape" the CFC's exclusive jurisdiction over certain contract claims by "styling [their] complaint[s] as one[s] for redress of constitutional torts and regulatory violations rather than as one[s] for breach of contract." *Evers v. Astrue*, 536 F.3d 651, 658 (7th Cir. 2008);

---

[2] There are other limitations on jurisdiction which also must be met.

*accord Kidwell v. Dep't of Army, Bd. for Corr. of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995).

But, the Seventh Circuit has noted, "crafty pleading," *see Evers*, 536 F.3d at 658, "cannot" be used to "avoid the jurisdictional limitations contained in the Tucker Act," *see Chi. Consortium*, 599 F.2d at 141. Such "forum shopping" would undermine Congress's remedial scheme, *see Kidwell*, 56 F.3d at 284, and is barred. And that raises a natural question: when is a claim, which may not be labeled as breach of contract, "founded . . . upon contract" such that it falls within the CFC's exclusive jurisdiction?

**B.     The test for when a claim is "founded . . . upon" contract**

To answer that question, federal courts have coalesced around the test adopted by the D.C. Circuit in *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982). *See, e.g.*, *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 97 (1st Cir. 2025) (applying *Megapulse* in a Tucker Act case). That test directs courts to consider two factors: "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse*, 672 F.2d at 968.

The parties to this suit agree that *Megapulse* provides the governing test. But the Seventh Circuit has not yet applied the test in the Tucker Act context.[3] And, of course, parties cannot stipulate to legal standards. *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991). Thus, while the court agrees that *Megapulse* supplies the proper standard, that conclusion bears further explanation.

While the Seventh Circuit has not applied the *Megapulse* test in a Tucker Act case, it has adopted it in a relevantly similar context. "The Contract Disputes Act applies to any express or implied contract entered into by an executive agency for the procurement of services." *Evers*, 536 F.3d at 657 (citing 41 U.S.C. § 602(a)). The CDA "provides that '[a]ll claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision.'" *Id.* (emphasis omitted) (quoting 41 U.S.C. § 605(a)).

In analyzing whether a claim relates to a contract for purposes of the CDA, the Seventh Circuit applied the *Megapulse* test. *Id.* at 657–58. In so doing, the Seventh Circuit noted that other courts have found the provisions of the CDA and the Tucker Act to be "parallel." *Id.* (quoting *A & S Council Oil Co. v. Lader*, 56 F.3d 234, 240 (D.C. Cir. 1995)). And it stands to reason that the Seventh Circuit would not have used the test and would not have cited the D.C. Circuit if it did not agree that the CDA's language was materially "parallel" to the Tucker Act's. And of course it would not have used the test if it did not agree with it. All that strongly suggests, if not

---

[3] Nor has the Supreme Court, at least explicitly.

outright predetermines, that the Seventh Circuit would apply the *Megapulse* test to Tucker Act issues as well.

Were that not enough, the court agrees that some test is necessary to avoid end runs around the Tucker Act and finds the *Megapulse* factors to be appropriate under Tucker Act precedent. The Supreme Court has recognized that the Tucker Act covers more than just those claims labeled "breach of contract." *See, e.g.*, *Dep't of Educ. v. California*, 604 U.S. 650 (2025) (per curiam). And both factors deployed in *Megapulse* have been used by the Supreme Court in Tucker Act cases to unveil "disguised contract action[s]," *Megapulse*, 672 F.2d at 968. *See NIH*, 145 S. Ct. at 2658 (looking at both the source of the rights for the claim and the remedy requested). Thus, precedent supports utilizing the *Megapulse* factors. Accordingly, the court finds the *Megapulse* inquiry to be the correct one.

\*

With that necessary legal background, the court next turns to analyzing whether the grants in this case are "contracts" for purposes of the Tucker Act, and whether the claims plaintiffs bring related to those grants are "founded . . . upon" contract such that the Tucker Act (and Little Tucker Act) applies.

## II.     Plaintiffs' Grants Are "Contracts" Falling Within The Tucker Act

"[M]any . . . federal grant programs [are] much in the nature of a contract." *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985) (quotation omitted). Grants are considered contracts because the grant recipient, "as a condition of receiving the grant, freely g[ives] its assurance that it w[ill] abide by the conditions of" the grant and its associated regulations. *Id.* at 638–39.

Recently, the Supreme Court has specifically confirmed that federal grants are contractual for purposes of the Tucker Act and Little Tucker Act. In *Department of Education v. California* the Supreme Court reviewed a TRO "enjoining the Government from terminating various education-related grants." 605 U.S. at 650. The district court had not only issued that injunction but had also "require[d] the Government to pay out past-due grant obligations and to continue paying obligations as they accrue[d]." *Id.* In that case, the Court stayed the TRO, finding (in part) that "the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* at 651 (quotation omitted). So too, in *NIH v. American Public Health Association* the Supreme Court treated the government grants as "contracts" in the sense contemplated by the Tucker Act and Little Tucker Act. *See* 145 S. Ct. at 2658 (citing *California*, 604 U.S. at 651). Other courts, albeit in dealing with slightly different grants, have all come to the same conclusion. *See, e.g.*, *Sustainability Inst. v. Trump*, 165 F.4th 817, 826 (4th Cir. 2026); *Council for Opportunity in Educ. v. U.S. Dep't of Educ.*, No. 25-CV-03491, 2026

8

WL 120984, at *7 (D.D.C. Jan. 16, 2026) (rejecting a litigant's claim that grants are not contracts).

There is no reason to think that the grants at issue in this case should be treated differently. In this case, too, plaintiffs agreed that "as a condition of receiving the grant" they would "abide by the conditions of" the grant and its associated regulations. *Bennett*, 470 U.S. at 638–39; [1] ¶ 26 ("Once awarded, the grant obligates both [Education] and the grantee to comply with the terms and conditions of the award[.]"). What is more, the parties have not raised any meaningful differences between the grants at issue in this case and those that were at issue in *California* and in *NIH*, nor does the court see any relevant differences. The court is thus assured that "[b]oth of [p]laintiffs' FSCS grants" constitute "multi-year" contracts "with a five-year project period running from January 1, 2024, through December 31, 2028." *Id.* ¶ 34.

But that conclusion does not resolve this case. Plaintiffs have not sued for breach of their grant contracts—or at least not explicitly. They have instead brought claims under the APA, the Fifth Amendment, the Spending Clause, and the First Amendment. The court thus must engage in the *Megapulse* inquiry to determine whether these claims are disguised contract claims that are "founded . . . upon" contract such that they belong in the CFC.

## III.   Most of Plaintiffs' Claims Are "Disguised Contract Claims"; A Couple Likely Are Not, But Precedent Is Unclear

The court considers two factors when determining whether a claim, while not pled as one for breach of contract, is really a breach of contract claim in disguise. Those factors are whether the source of the right asserted is contract, and whether the remedy requested (or appropriate) is contractual in nature. *See, e.g.*, *Evers*, 536 F.3d at 657–58; *Megapulse*, 672 F.2d at 968. After considering those factors as well as precedent interpreting those factors, it is clear that plaintiffs' APA, Fifth Amendment, and Separation of Powers claims are disguised contract claims. Plaintiffs' First Amendment claims are likely not disguised contract claims, but precedent makes the issue unclear.

### A.   Counts I–VI are disguised contract claims belonging to the CFC

Under *Megapulse*, a legal theory is not based in contract where the rights the litigant is claiming "existed prior to and apart from rights created under the contract," *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985) (discussing *Megapulse*)—in other words, where the rights asserted are "truly independent" from the contract, *Megapulse*, 672 F.2d at 970. And that rule can be formulated inversely, too: where the rights a litigant is claiming are *dependent* on the contract between two parties, the claim is contractual in nature for purposes of the Tucker Act. In this case, each of Counts I–VI is dependent on plaintiffs' grant

9

contract. Moreover, "the type of relief" plaintiffs "s[eek]" or which is "appropriate" is contractual as well. *Id.* at 968. That is because most of the remedies sought are best categorized as specific performance, a classic contractual remedy, or are considered contractual under precedent.

### 1.    Plaintiffs' APA claims are "founded . . . upon contract"

Count I of plaintiffs' complaint alleges that Education "acted arbitrarily and capriciously," in violation of the APA, "because the Notices of Non-Continuation and Denial Letters" issued by Education "failed to identify any deficiencies in [p]laintiffs' grant performance, compliance, or progress toward approved objectives, as required by governing regulations" and instead "relied on vague and conclusory assertions that continuation was not in the best interest of the Federal Government." [1] ¶¶ 54–55 (quotation omitted).

The court begins with the first *Megapulse* factor—whether the rights asserted are contractual. *Megapulse*, 672 F.2d at 968. The rights asserted in Count I are not independent of plaintiffs' grant contract because plaintiffs' ultimate request is to secure rights created in the first instance by contract.

An analogous case from the D.C. Circuit, *Spectrum Leasing Corp.*, provides a helpful explanation for cases where government contracts and rules governing those contracts are both at issue. The appellant in that case, Spectrum, "provide[d] data processing equipment and related software and services." 764 F.2d at 892. As a result of alleged breach of a contract between Spectrum and the General Services Administration, "the government collected" "liquidated damages by returning Spectrum's hardware invoices unpaid." *Id.* Spectrum sued in response, "claiming that by withholding payments" in the way that the government withheld them, the government "violated the procedures set forth in the" Debt Collection Act of 1982 for the collection of debt. *Id.* (citing 31 U.S.C. § 3701 *et seq.*). But despite Spectrum's citing the DCA, the D.C. Circuit found that the action was contractual and subject to the Tucker Act, commenting that "[a]lthough the DCA might impose procedural requirements on the government having some impact on the contract, the Act in no way creates the substantive right to the remedy Spectrum seeks." *Id.* at 894. Though procedural requirements from statute governed the contract, ultimately the dispute in *Spectrum Leasing* was still about a contract and what was and was not owed under that contract.

Plaintiffs' APA claim in Count I is no different. If plaintiffs ultimately have any right to continued grant funding, it would stem from their grant contract. And if plaintiffs have any right to a particular action under the contract, it also would stem from their grant contract. Like in *Spectrum Leasing*, the "right to" any action under or "payment[]" under the grant "[wa]s created in the first instance by the contract, not by the" statutes governing grant contracts. *Id.* at 894. Plaintiffs allege regulatory and statutory violations, *see* [1] ¶ 54 (citing 34 C.F.R. § 75.253(b)), but those rules

simply govern how Education must act in the course of its grant contracts. They provide no rights to any person or entity who does not first enter into a grant contract. The APA rights plaintiffs claim are not "truly independent" from the contract itself. *See Megapulse*, 672 F.2d at 970.

These dependent rights should be contrasted with rights that meaningfully exist in non-contractual scenarios and that just so happened to be violated during the course of a contractual relationship. For example, take the facts of *Megapulse* itself. Megapulse, Inc., developed long-range transmission technology. *Id.* at 961. "Feeling that" the technology "might have valuable military . . . application," Megapulse's founder "invited the Coast Guard" "to witness a demonstration." *Id.* That led to a "series of agreements" "for the demonstration and development of" Megapulse's technology "for government-use." *Id.* A provision in one agreement "required Megapulse to construct and test a demonstration model" "and submit a report with test results and recommendations." *Id.* Another provision "granted the government the right to 'duplicate, use and disclose in any manner'" "all or any part of the technical data delivered by [Megapulse] to the Government under this contract." *Id.* (quotation omitted). But another agreement specified that "[d]ata not first produced in performance of the contract was to remain property of" Megapulse. *Id.* at 962. For such data, Megapulse reserved the right to mark it as "limited rights" data. *Id.* Later in 1977, Megapulse submitted some "engineering drawings and specifications" "marked" as "limited rights data." *Id.*

Subsequently, due to business dealings with several bidders who objected to these data restrictions, "the Coast Guard informally reviewed the proprietary status of the 'limited rights' data and determined that it was unlikely that significant portions" "were developed entirely at Megapulse's expense." *Id.* "As a result of this determination, the Coast Guard advised Megapulse" "that it would remove all restrictions against commercial use," and Megapulse, in response, "filed suit in" federal district court "to enjoin the Coast Guard's release of the proprietary data." *Id.* "Megapulse identified" "six specific drawings" for which it claimed that the "unrestricted release" of the drawings by the Coast Guard would "violate[] the Trade Secrets Act." *Id.* at 963. That Act provides that when "an officer or employee of the United States" "publishes, divulges, discloses, or makes known in any manner or to any extent not authorized by law any information coming to him in the course of his employment," he has violated the law and "shall be fined . . . or imprisoned not more than one year, or both" and "shall be removed from office or employment." 18 U.S.C. § 1905.

The *Megapulse* plaintiff's rights against the unauthorized disclosure of proprietary data existed independently of any contract that they had signed. The Trade Secrets Act provides protection against the unauthorized release of data any time "an officer or employee of the United States" "publishes, divulges, discloses, or makes known in any manner" "information coming to him in the course of his employment," regardless of whether he obtains that information pursuant to a

11

contractual relationship. 18 U.S.C. § 1905; *see also F.T.C. v. Owens-Corning Fiberglas Corp.*, 626 F.2d 966, 969, 971–72 (D.C. Cir. 1980) (discussing the rights afforded by the Trade Secrets Act when information was obtained by the government pursuant to a subpoena in an antitrust investigation). Rights under the Trade Secrets Act, then, do not depend on the existence of a contractual relationship. They exist independently. Accordingly, the *Megapulse* court found that Megapulse's rights were not sourced in contract. 672 F.2d at 969. But that is not true in this case. The rights plaintiffs assert do not apply absent first entering into a contract.

The fact that the CFC may have to rule on a statutory or regulatory issue does not change the contract calculus. The *Megapulse* court explained that "the mere fact that a court may have to rule on a contract issue does not . . . transform an action based on trespass or conversion into one on the contract." *Id.* at 968. For example, "in an action for trespass" a "license" may "be raised as a defense," but that action would not be contractual. *Id.* In *Megapulse* itself, whether the Coast Guard violated Megapulse's rights turned on what data was confidential under the contract, for if the contract deemed the information shareable, disclosure of the information would have been "authorized by law" for purposes of the Trade Secrets Act. Notwithstanding that, the primary source of Megapulse's rights against improper disclosure was still the statute itself. The government simply had a contract-based defense for why the Act was not violated. This case, however, is the inverse of *Megapulse*. Here, the statutory and regulatory rights plaintiffs assert only attached to them by virtue of entering into a contract with Education. The rights claimed are contractual—the contract simply incorporates, and is governed by, regulations. *See, e.g.*, [28-2] at 4. And while the question of whether plaintiffs' contractual rights were violated overlaps with whether the statutes and regulations were violated, "the mere fact that a court may have to rule on a [statutory or regulatory] issue does not . . . transform an action based on [contract] into one" based on the APA. *Id.*

The Seventh Circuit confirmed that in *Evers*. In *Evers*, too, the Seventh Circuit recognized that there might be overlap between contractual and regulatory rights, for "every government agency is bound to follow some set of regulations." 536 F.3d at 661 (quotation omitted). But that overlap between contractual and statutory or regulatory requirements governing contracts does not mutate fundamentally contractual claims into regulatory or statutory ones. That is because "every government agency is bound to follow some set of regulations"; consequently, were merely alleging that those regulations were violated sufficient to evade the CFC, "every government contractor could recast its contract claims as regulatory claims." *Id.* (quotation omitted). *Evers*, along with other cases and common sense, says that cannot be. *See id.* (citing *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985) (That a contract "termination also arguably violates certain other regulations does not transform the action into one based solely on those regulations. Nor does plaintiff's decision to allege only a violation of the regulations change the essential character of the action.")).

12

Turning next to the second *Megapulse* factor, "the type of relief sought (or appropriate)." 672 F.2d at 968. Plaintiffs request that the court "[v]acate" the non-continuation notices, "enjoin" Education not to "enforc[e]" the non-continuation notices, and "[o]rder" Education to "review" their "eligibility for a continuation award," including ordering Education to "release . . . funding" "if necessary." [1] at 26. Each of these remedies is contractual in nature.

Start with the most obvious—releasing funds owed on the contract. That is obviously contractual, as it would be "relief designed to enforce" the "'obligation to pay money' pursuant to . . . grants." *NIH*, 145 S. Ct. at 2658 (quoting *California*, 604 U.S. at 651). The Supreme Court has found that such relief, releasing grant funds, makes the claim likely[4] to be contractual for Tucker Act purposes. *Id.* (quoting *California*, 604 U.S. at 651).

Vacatur of the grant non-continuation decision is contractual too. In fact, a request to "vacat[e] the Government's termination of . . . grants" due to an APA violation is precisely the sort of claim the Supreme Court found was likely subject to the Tucker Act in *NIH*. *Id.* at 2659–61. As Justice Gorsuch described, the *NIH* "respondents' . . . alleged right to payment stem[med] from the government's refusal to pay promised grants according to the terms and conditions that accompany them." *Id.* at 2664 (Gorsuch, J., concurring in part and dissenting in part). The request for vacatur, then, was simply a request to undo the non-payment decision based on the grounds that the decision went against the terms of the contract. Unwinding an action taken under a contract because it went against the contract's terms, thereby "reinstat[ing]" the contract, is contractual in nature. *Id.* at 2661 (Barrett, J., concurring).

Unwinding a contractual action via vacatur because the action went against the contract's terms, thereby reinstating the contract, is precisely what plaintiffs request in this case. Education's non-continuation decisions were made citing contractual provisions in the grants themselves. The contract plaintiffs and Education signed incorporated terms and conditions regarding the continuation of funding that are authorized and / or required by federal regulation and by statute. *See, e.g.*, [28-2] at 4. When Education elected not to continue funding, it cited those conditions. *See, e.g.*, [1] ¶ 36. In other words, Education cited a contractual term which it believed allowed it to exit the contract before the completion of the contract's term, much in the way a tenant could buy out his lease contract for a predetermined price. Plaintiffs simply disagree that Education had a fair interpretation of the exit clause, and as a remedy seek to undo Education's exit and reinstate Education's

---

[4] Because *NIH* was about whether to grant a stay, the Supreme Court was making a prediction about the Tucker Act issue—not making a final determination of that question.

13

contractual obligations. Plaintiffs' request for vacatur is thus "relief designed to enforce" the terms of the contract. *NIH*, 145 S. Ct. at 2658.

Plaintiffs would draw a distinction between vacating grant terminations and vacating grant non-continuations. *See* [30] at 13–14. Their argument is that vacating a grant non-continuation would not "result automatically in the disbursement of funds" in the way that vacating a grant termination would. *Id.* at 13. But that argument, which the court acknowledges was adopted by the Ninth Circuit, *see Washington v. U.S. Dep't of Educ.*, 161 F.4th 1136, 1139 (9th Cir. 2025), is unconvincing.

That difference between termination and non-continuation, here, is a legally immaterial one, as the impact of vacating a grant termination decision and a grant non-continuation is the exact same: it places the government in the position of having to comply with the contract in the way that the grantee claims it ought to be complied with. For example, say a grantee has a four-year grant where $10,000,000 will be disbursed every year. And say that the government may terminate that contract if $X$ condition obtains. The government terminates the grant, citing that $X$ condition obtained, and the grantee sues to vacate the grant termination, arguing that $X$ condition did not obtain. If the grantee wins, the government either has to pick a new reason to terminate the grant or must keep paying out on the grant. That scenario is what the Supreme Court found likely to fall within the Tucker Act in *California* and in *NIH*. The impact of vacatur of a non-continuation decision, like in this case, is no different. Here, Education's contract with plaintiffs says that Education may back out of the contract—*i.e.*, end the grant term early—if $Y$ condition obtains. Education backed out of the contract, citing that $Y$ condition obtained. Plaintiffs, however, disagree that $Y$ condition obtained. If the court accepted plaintiffs' argument and vacated the non-continuation decision, Education would either need to provide a different reason to stop issuing new grant funds, or be required to issue a continuation award and then keep paying out on the grant contracts. The difference between vacating a grant termination decision and vacating a grant non-continuation decision is illusory. In both cases the request is fundamentally the same: a reversal of a contractual action designed to reinstate the government's obligation to provide grant funding. *See NIH*, 145 S. Ct. at 2661 (Barrett, J., concurring); *see also Evers*, 536 F.3d at 660.

Plaintiffs further request that the court enjoin Education to comply with the grant contract after vacatur of the non-continuation decisions. *See* [1] at 26 (requested remedies E, F, and G). Those requests are "aptly described as . . . request[s] for specific performance," as they seek to force Education to comply with contractual terms. *Evers*, 536 F.3d at 660 (cleaned up). Precedent is clear: requests for specific performance are contractual remedies for purposes of *Megapulse*. *See, e.g.*, *Evers*, 536 F.3d at 660; *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1111 (D.C. Cir. 2022) (A claim "sound[s] in contract" where it seeks "the classic contractual remedy of specific performance." (quotations omitted)).

14

Plaintiffs argue that because these requests are not to "enforce a contractual obligation to pay money," they are not contractual. [30] at 13 (quotation omitted). But their argument does not grapple with the precedent about specific performance. Plaintiffs also argue that "[b]ecause the Court of Federal Claims' jurisdiction is limited to monetary claims, it does not extend to the type of prospective relief" they "seek here." *Id.* at 7. Plaintiffs may indeed be correct that the Court of Federal Claims cannot provide non-monetary relief. *See Megapulse*, 672 F.3d at 963 n.13. But even assuming that premise is true, plaintiffs' conclusion does not follow. "[T]he fact that the Tucker Act does not allow the specific relief [p]laintiffs seek does not mean that their claims must proceed" in district court; "rather, it shows that Congress made the dispositive choice" that the remedies "for contract claims against the United States" are "limited." *Sustainability Institute*, 165 F.4th at 828 n.7. In this case, Congress has assigned contract claims to the CFC. And "when Congress has dealt in particularity with a claim and has intended a specified remedy—including its exceptions—to be exclusive, that is the end of the matter." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 216 (2012) (quotation omitted) (cleaned up).

Plaintiffs' final remedial request is for declaratory relief—specifically, a request that the court "[d]eclare that" Education's actions were "arbitrary, capricious, contrary to law, and in excess of statutory authority, in violation of the" APA. [1] at 25. Plaintiffs do not identify a specific source of authority for this request, but the court construes it as one made under the Declaratory Judgment Act ("DJA"), which is the general source of authority for federal courts to provide declaratory relief. 28 U.S.C. § 2201 *et seq*.

The court does not have jurisdiction to entertain this request because the underlying action is contractual under *Megapulse*. "The operation of the Declaratory Judgment Act is procedural only": "Congress enlarged the range of remedies available in the federal courts but did not extend their jurisdiction." *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950) (quotation omitted) (cleaned up). In other words, and as the Fourth Circuit has helpfully explained, the "Act itself" is not "a cause of action," as otherwise "federal court jurisdiction" would be "extend[ed] . . . to most any case where a plaintiff sought a declaration," which the "Supreme Court tells us . . . cannot be so." *Honeywell Int'l Inc. v. OPTO Elecs. Co.*, 135 F.4th 170, 178 (4th Cir. 2025) (Richardson, J.) (citing *Skelly Oil*, 339 U.S. at 671). And that means the DJA itself is not a basis for jurisdiction; rather, jurisdiction to enter a declaratory judgment is tethered to an underlying cause of action which must provide the basis for jurisdiction. For example, "[p]rior to" the DJA, "a federal court would entertain a suit on a contract only if the plaintiff asked for an immediately enforceable remedy like money damages or an injunction, but such relief could only be given if the requisites of jurisdiction . . . provided foundation for resort to the federal courts." *Skelly Oil*, 339 U.S. at 671. The DJA did not change that: jurisdiction to provide a declaration on a contract issue is tied to whether the court in which the litigant seeks

15

the declaration would otherwise have jurisdiction over the contract claim. In this case, the court does not for the reasons explained above.

Because the source of the right plaintiffs assert in Count I is contractual, and because their requested (or appropriate) remedies are contractual as well, the court lacks jurisdiction over this claim. *Megapulse*, 672 F.2d at 968. That means the court lacks jurisdiction over plaintiffs' request for a declaratory judgment as well. *See also Clark v. United States*, 596 F.2d 252, 253 (7th Cir. 1979) (per curiam) (the "prayer" for "declaratory relief" "is subsumed by the basis of the[] suit" for Tucker Act purposes).

*

For the same reasons, the court lacks jurisdiction over plaintiffs' other APA counts.

In Count II, plaintiffs allege that Education's "non-continuation decisions are contrary to law" in violation of 5 U.S.C. § 706(2)(A) "because they misinterpret and misapply the regulatory framework governing continuation awards for multi-year discretionary grants." [1] ¶ 64. Plaintiffs allege that by "interpreting the regulation[s] to permit non-continuation based on undisclosed and retroactive policy preferences unrelated to grant performance, [Education] acted contrary to law in violation of the APA." *Id.* ¶ 68. This is substantively identical to the claim in Count I: any right plaintiffs assert against Education's decisions is one that does not exist independently of the contract, and the fact that the meaning of the contract and the statute/regulation overlap does not change that. Moreover, for Count II, plaintiffs request the same remedies as for Count I. Count II is thus contractual under *Megapulse*. That also means the court lacks jurisdiction to enter a declaration that the APA was violated. Count II is a disguised contract claim which belongs to the CFC.

Count III is no different. Plaintiffs allege that Education exceeded its statutory authority by using information coming from "[a] congressionally-mandated application" as "evidence against [p]laintiffs." [1] ¶ 75. Essentially, plaintiffs allege that a statute required plaintiffs to certify what efforts they took to address diversity, equity, and inclusion, *see id.* ¶¶ 69–75, and that the contract (and thereby the statute) did not permit the answers to that question to be used to deny a continuation award. But, again, any right plaintiffs claim here stems from contract, and whether Education's decisions were permissible just turns on the terms of the contract, which incorporate the relevant regulations. Ultimately, what plaintiffs ask for is to enforce their contractual terms and to receive funding if the contract requires it. Moreover, plaintiffs request the same remedies. Thus, the same result obtains: Count III belongs to the CFC.

16

### 2. Plaintiffs' Fifth Amendment claims are "founded . . . upon contract"

Count VI alleges that Education's "actions violated [p]laintiffs' Fifth Amendment rights to procedural due process by depriving them of fair notice and a meaningful opportunity to be heard before the loss of federal grant funding." [1] ¶ 92. This is because, plaintiffs allege, the "awarding of continuation awards" is "based on a detailed statutory and regulatory scheme," and that "framework, together with the longstanding practice of making decisions to award continuation awards on the basis of performance rather than application content, created reasonable procedural expectations that [p]laintiff[s'] continuation award determinations would be made in accordance with these procedures." *Id.* ¶¶ 94–95. But this claim is just a constitutionalized version of plaintiffs' APA claims, and such recasting of claims is prohibited. Moreover, a nearly identical claim in *Evers* was considered contractual because any due process rights are the product of, and thus dependent on, the contractual agreement. Further, plaintiffs request the same remedies they requested to alleviate Education's alleged APA violations, and those remedy requests cut against jurisdiction for the reasons explained previously.

To start, while plaintiffs cite statutory provisions, those statutory provisions only apply because plaintiffs entered into grant contracts. They provide no rights to any person or entity who does not first enter into a grant contract. In this sense, plaintiffs' Due Process claim is just a constitutionalized version of their APA claims. *Compare id.* ¶¶ 92, 94–95 ("[Education's] actions violated [p]laintiffs' Fifth Amendment rights" because there was a "longstanding practice of making the decision[s] . . . on the basis of performance," in part "based on a detailed statutory and regulatory scheme," and Education departed from that practice without "fair notice."), *with id.* ¶ 54 ("[Education] acted arbitrarily and capriciously because the Notices of Non-Continuation and Denial Letters failed to identify any deficiencies in [p]laintiffs' grant performance, compliance, or progress toward approved objectives, as required by governing regulations."). But as the Seventh Circuit explained in *Evers*, where the "claimed violation[s] of federal regulations" are nearly identical to a litigant's "due-process claims," they should be treated identically. 536 F.3d at 661. In this case, because the former is a contractual claim, the latter is too. And quite sensibly as well, as any other result would allow litigants to avoid Congress's jurisdictional limitations by recasting their claims under different labels. *See, e.g., id.*

Consider also what resolving plaintiffs' claim would entail. To make out a procedural due process claim for the deprivation of a property interest without proper notice, a litigant must show that they were "deprived" of something they had "a property interest" in to begin with. *Id.* at 658 (citing *Domka v. Portage Cnty.*, 523 F.3d 776, 779–80 (7th Cir. 2008)). But property interests must come from a source. And while a Fifth Amendment deprivation of property claim is based on the Constitution, the source of the property right is not the Constitution. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538 (1985). Some other source is required.

It is well accepted that one possible source is contract. *See Cheli v. Taylorville Cmty. Sch. Dist.*, 986 F.3d 1035, 1039 (7th Cir. 2021). For example, if "the terms of" an "employment" contract "provide that termination will only be 'for cause' or 'otherwise evince mutually explicit understandings of continued employment,'" that employment contract might create a "protected property interest" in a pre-termination cause hearing. *Id.* (quotation omitted). That is because when the government entered into the contract, it created a "legitimate expectation," cognizable in the Fifth Amendment, that the contract's terms would be followed. *Id.*

Plaintiffs allege that, under the terms of their grant contracts, they could only have their funding discontinued for performance issues, or other issues that do not include a change in priorities from presidential administration to presidential administration. But that is a dispute about what clauses in the grant contracts mean, and thereby what expectations Education created when it signed the contracts. Who is right about what the contracts mean and whether a property interest was created are all questions about the grant contracts. Count VI is therefore in no sense "truly independent of" the grant contracts. *Megapulse*, 672 F.2d at 970.

*Evers* itself confirms this result. In that case, "Evers, a board-certified neurologist, worked as a medical consultant for the" Social Security Administration "pursuant to a contract." *Evers*, 536 F.3d at 653. After an incident, Evers was fired "for cause." *Id.* at 654. Evers then filed "a three-count complaint." *Id.* at 655. Count I alleged that his "Fifth Amendment right to procedural due process" was violated by for-cause firing "without a meaningful opportunity for review," and also that "he had a property interest in the remaining" time on his contract. *Id.* That is identical to plaintiffs' claim here, where they allege that Education's "actions violated Plaintiffs' Fifth Amendment rights to procedural due process by depriving them of fair notice and a meaningful opportunity to be heard before the loss of federal grant funding." [1] ¶ 92. Both were decisions made during a contractual relationship, and both involve allegations that a contract with the government created property interests. But as the Seventh Circuit held in *Evers*, "the characterization or labeling of claims by the pleader is not controlling." 536 F.3d at 658. Evers's "contract" was "the source of his rights" because "a court would need to analyze the contractual terms and provisions governing termination and suspension" to determine whether his procedural due process rights stemming from the contract were violated. *Id.* at 659.

The source of plaintiffs' claimed Due Process rights is really their contract with Education. And as noted at the outset of the section, their other requested remedies of vacatur, specific performance (described as injunctive relief), and the release of funds "if necessary" are all contractual. Because both the source of plaintiffs' rights and their requested remedies are contractual, Count I is a disguised contract claim belonging to the CFC. *See Megapulse*, 672 F.2d at 968. As a consequence, the court also lacks jurisdiction over their requested declaration that the Due Process Clause was violated. *See* Section III(A)(1), *supra* (citing *Skelly Oil*, 339 U.S. at 671).

\*

The court lacks jurisdiction over plaintiffs' other Fifth Amendment claim too. In Count V, plaintiffs allege that they were subjected to unconstitutionally vague rules. More specifically, plaintiffs claim that Education "relied on the claim that continuation of [p]laintiff's grants was not in the 'best interest of the Federal Government' without providing a clear definition of that term" and that, consequently, the "best interest standard functioned as an open-ended and discretionary basis for denying continuation funding, which permitted decisions based in indeterminate discretionary criteria rather than objective measures." [1] ¶¶ 87–88. That "indeterminate standard," which "invite[d] arbitrary enforcement," was allegedly a violation of the Fifth Amendment because it made it so "regulated parties" did not "know what [wa]s required of them." *Id.* ¶¶ 86, 89 (quotation omitted).

Plaintiffs' theory boils down to a claim that the terms of their contract with the government were unclear; such an argument, also known as an indefiniteness defense in contract law, is contractual under *Megapulse*. Whether the contract is indeed unclear is just a question about what the parties contemplated when they signed the contract. In other words, the operative question is whether it was clear that the contract permitted Education to cite changes in presidential administration priorities as a basis to conclude it is no longer in the "best interest of the Federal Government" to continue grant funding. *Id.* ¶ 87. If it clearly did, plaintiffs were not subject to a vague contractual provision—the provision simply gave Education wide latitude. And if it was indefinite, the appropriate remedy would be to unwind the contractual action, declare the "best interest" clause invalid, and enforce the contract pursuant to its other terms. And those are exactly the remedies plaintiffs seek and which the court has already explained are contractual, as they are requests for specific performance or the vacatur of a contractual action and reinstatement of the contract. Plaintiffs' rights, if any, are fundamentally dependent on their contract with Education, and their sought and appropriate remedies are contractual, rendering their claim contractual under *Megapulse*. 672 F.2d at 969.

The Seventh Circuit dealt with a similar claim in *Evers*. In that case, Evers was fired after "a verbal altercation" with a Social Security Administration employee. *Evers*, 536 F.3d at 654. In Count II, he alleged that the Social Security Administration "deprived [him] of his Fifth Amendment right to substantive due process because terminating his contract was an overreaction" to the incident that had led to his firing, and consequently the firing "shock[ed] the conscience." *Id.* at 655. But the Seventh Circuit concluded that the claim was contractual in nature, describing the argument as a "histrionic way of arguing" that the government "committed a breach of contract." *Id.* at 660. That was because Evers would have only had a valid substantive due process claim if he was right about how to read his contract. *Id.* at 660–61. Whether or not Evers was fired for a reason contemplated by the contract, and thereby whether his firing "shocked the conscience," turned on what his contract

contemplated as a valid reason for termination. Any substantive due process right was thus dependent on Evers's contractual terms.

Count V of plaintiffs' complaint is no different than Evers's substantive due process claim. Whether plaintiffs were subject to unduly vague rules simply turns on whether the terms of the grant contracts are vague. As such, "Count [V] does not raise an independent constitutional claim, but merely argues vociferously that the contract" was unclear. *Id.* at 661.

### 3. Plaintiffs' separation of powers claim is "founded . . . upon contract"

Plaintiffs' next claim in Count IV is nominally brought under the Constitution's Spending Clause. But really it is a contract claim, disguised as an APA claim, disguised as a constitutional claim. That one extra layer of camouflage, however, does not change the result.

Count IV alleges that Education's "actions violate[d] the Spending Clause" because they were "an exercise of authority not granted to the Executive Branch," [1] ¶ 77—more specifically, that Education "applied their own funding conditions" in a way not contemplated by "the statutory and regulatory criteria" envisioned by Congress, *id.* ¶ 80. Put more simply, plaintiffs allege that Education acted contrary to statute or regulation, and, in so doing, violated Congressional directives and thereby the Constitution.

This claim should have a whiff of familiarity, as it is plaintiffs' APA argument recast in a slightly different way. Again, plaintiffs allege that Education violated contractual terms that also exist in a statute or regulation. They then go a step further and claim the statutory violation also offends the Constitution. While not labeled as such, plaintiffs' claim is also known as an *ultra vires* claim. In an *ultra vires* claim regarding an agency, a litigant alleges that an agency lacked the statutory or regulatory authority to take the action that it did. *See Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 680 (2025). They then sue for relief outside the statutory or regulatory limits on relief, *see id.*, sometimes casting the legal violation in terms of the constitution, *see Dalton v. Specter*, 511 U.S. 462, 472 (1994). But courts have recognized this maneuver, explaining that "[p]laintiffs" often attempt to "style their [statutory] claims as constitutional." *Sustainability Institute*, 165 F.4th at 831 (discussing the Supreme Court's precedent on *ultra vires* claims).

Such styling of fundamentally contractual claims as something else is precisely what the *Megapulse* test is designed to detect. *See Megapulse*, 672 F.2d at 969. Plaintiffs argue that "whenever" Education "acts in excess of [its] statutory authority"—which, here, is the same as its contractual authority—"[it] also violates the constitutional separation-of-powers doctrine." *Sustainability Institute*, 165 F.4th at 831. But as explained in Section III(A)(1), *supra*, every agency that enters

contracts "is bound to follow some set of regulations" governing those contracts. *Evers*, 536 F.3d at 661 (quotation omitted). So, were contractors able to "recast" their contract claims in terms of those regulations, Congress's jurisdictional limits would be "nullif[ied]." *Id.* (quotation omitted). That recasting maneuver is thus barred. *See* Section III(A)(1), *supra.* The plaintiffs in this case attempt the same maneuver by adding a disguise atop a disguise. They have taken a contract claim and recast it as a regulatory claim. And they have then taken that exact same regulatory claim and recast it as a separation of powers claim. But in the same way that every agency that makes a contract is "bound to follow some set of regulations," every agency that "is bound to follow some set of regulations" is also bound to follow the Constitution. *Evers*, 536 F.3d at 661 (quotation omitted). So, the same "recast[ing]" issue *Evers* discussed is present where a litigant attempts to transform his regulatory or statutory claim, which is founded on contract, into a separation of powers claim. The court thus follows *Evers* in declining to countenance such an attempt to evade its jurisdictional limits. *See id.* at 658 ("[S]uch a tactic, albeit crafty pleading, will not suffice."). Accordingly, Count VI belongs to the CFC.[5]

### B. Counts VII–VIII are constitutional claims which likely belong here, but precedent is unclear

Plaintiffs' final set of claims allege violations of the First Amendment. While those alleged violations occurred during the course of plaintiffs' contractual dealings with Education, plaintiffs assert rights which are "truly independent" of their contract. But murky precedent casts doubt on whether several of plaintiffs' requested and appropriate remedies are non-contractual too. And that leaves the court with doubts as to its jurisdiction.[6]

Count VII alleges that "[p]laintiffs engaged in protected speech by expressing their mission, values, and commitments in their grant applications" and were denied funding "for what they said about their beliefs, values, and experience," as opposed to their "use of federal funds." [1] ¶¶ 101, 105–06. In other words, plaintiffs allege that they expressed a viewpoint and that they were retaliated against as a response to the expression of that viewpoint. *See, e.g.*, *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019).

First Amendment rights against viewpoint discrimination and retaliation "exist[] prior to and apart from rights created under" any contract. *Spectrum Leasing*, 764 F.2d at 894. Take an illustrative hypothetical example. Say, hypothetically, a grant applicant was applying for a government grant contract in the first instance

---

[5] The same remedies are requested for this count as well. Those remedies are contractual or otherwise barred for the reasons given in the prior sections.

[6] The legal effect of the court's finding that it likely has jurisdiction is discussed in a contemporaneously filed opinion denying a preliminary injunction. *See* [62] at 4–6.

instead of applying for continued funding on an existing grant contract. And say, hypothetically, that when they filled out the initial grant application, they were explicitly told that they were not receiving the grant because of their views on a particular policy issue, like the proper minimum wage. In the hypothetical, the applicant would not yet have received any contract and thus any First Amendment rights the applicant might have against viewpoint discrimination or retaliation would not turn on a contractual relationship. Those First Amendment rights—which are what plaintiffs assert in Count VII—are not dependent on first signing a contract. They are "truly independent." *Megapulse*, 672 F.2d at 970.

Comparing these independent First Amendment rights to the dependent procedural due process rights plaintiffs assert in Count VI provides a helpful contrast. For the procedural due process claim in *Evers*, the Seventh Circuit explained that because "a court would need to analyze the contractual terms and provisions governing termination and suspension" to determine whether Evers's procedural due process rights stemming from the contract were violated, the rights asserted were contractual in nature. *Evers*, 536 F.3d at 659. That is not true of the analysis of a First Amendment claim. The contract's terms, and the statutes or regulations governing the contract, could attempt to authorize viewpoint discrimination but First Amendment doctrine, not contract doctrine, would still govern the analysis. *See, e.g.*, *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013).

This is all true even though the factual circumstances leading to the alleged First Amendment claims "relate to" the course of a contractual arrangement. *Evers*, 536 F.3d at 659. The Seventh Circuit explained as much in *Evers*. The *Evers* court explained that if Evers had "alleged that" the Social Security Administration "defamed him by making negative false statements to third parties about his work pursuant to the contract," that claim might, at least in a colloquial sense, "'relate to' the contract." *Id.* But that relation would likely not be enough to make the claim contractual because "the source of Evers's rights would" nevertheless "lie in tort." *Id.* Rights against defamation pre-exist, and are independent from, any contractual relationship, whether or not defamatory statements are made about a party's actions taken pursuant to the contractual relationship. That same principle is reflected in *Megapulse* itself for the reasons explained in Section III(A)(1), *supra*. As discussed previously, in that case Megapulse's Trade Secrets Act rights against the improper disclosure of data were allegedly violated during the course of its contract with the Coast Guard. *Megapulse*, 672 F.2d at 961–63. But because those rights existed independently of any contract, the fact that they were violated during a contractual relationship did not matter for Tucker Act purposes. Like in *Evers* and in *Megapulse*, to make out their claim, plaintiffs need not "rely[] on the contract" at all. *Id.* at 969.

The second prong, "the type of relief sought (or appropriate)," *see id.* at 968, presents difficulties. Plaintiffs request the same general suite of remedies they requested on the other counts: vacatur of the non-continuation decision, an injunction to comply with the contract moving forward, the release of grant funds if necessary,

an injunction not to rely on viewpoint-based criteria moving forward, and a declaration that their First Amendment rights were violated. [1] at 25–26. Ultimately, the precedent discussed below convinces the court that it likely has jurisdiction over part of this suit. But the court has serious reservations. The precedent in this area of law is quite muddied, and this case presents unique scenarios not fully addressed by precedent. Moreover, some of plaintiffs' remedial requests, although inappropriate, are plainly contractual. The court begins with precedent, then moves to application.

Precedent supports the notion that just because granting relief might logically have a subsequent impact on a contractual relationship with the government, the relief is not necessarily contractual (for Tucker Act purposes) in nature. Start with the Court's recent discussion in *NIH*. That case dealt with two challenges: first was an APA challenge to vacate internal guidance documents which stated that "[g]oing forward," NIH "w[ould] not fund research related to DEI objections," etc.; second was a challenge to vacate "numerous decisions terminating existing grants" made in accordance with those documents. 145 S. Ct. at 2661 (Barrett, J., concurring). Justice Barrett's controlling concurrence[7] explained that "the District Court likely lacked jurisdiction to hear challenges to the grant terminations" under the Tucker Act, but that the same was not true for the challenge to "vacate the guidance documents." *Id.* (Barrett, J., concurring).

In *NIH*, there was seemingly no dispute by the parties that the grant terminations resulted from the guidance documents. *See id.* at 2663 (Roberts, C.J., concurring in part and dissenting in part) (the government did not "contend[] that the" challenged "terminations did not result from the directives"). Logically, then, vacating the guidance documents might affect those grant terminations. *See id.* at 2662 (Barrett, J., concurring); *id.* at 2663 (Roberts, C.J., concurring in part and dissenting in part, joined by three other Justices). Nevertheless, a majority of the Court—Justices Barrett, Roberts, Sotomayor, Kagan, and Jackson—found that the challenge to vacate the guidance documents was unlikely contractual for purposes of the Tucker Act, and that the claim could likely remain in federal district court. *See id.* at 2661 (Barrett, J., concurring); *id.* at 2663 (Roberts, C.J., concurring in part and dissenting in part). That vacating the guidance documents might logically impact a subsequent suit in the CFC challenging the grant terminations seemingly did not matter for purposes of the Tucker Act.

---

[7] Justice Barrett's *NIH* opinion represents the narrowest grounds for the majority disposition and thus seems controlling under *Marks v. United States*, 430 U.S. 188, 193 (1977), assuming (although the court is not aware of any decision on this issue) that *Marks* applies to emergency docket orders.

23

That aspect of *NIH* may have derived from *Bowen v. Massachusetts*, 487 U.S. 879 (1988).[8] In *Bowen*, there was a claim that the "Secretary of Health and Human Services" was unlawfully "refusing to reimburse" Massachusetts for "expenditures under its Medicaid program." *Id.* at 882. Essentially, as a matter of statute certain funds were reimbursable if they were "rehabilitative," but auditors determined some services were not and disallowed over $6,000,000 in claimed reimbursements. *Id.* at 886–87, 886 n.6. The "District Court issued an opinion" "h[olding] that the services in question were in fact rehabilitative" as a matter of federal law. *Id.* at 888. The "judgment did not purport to state what amount of money, if any, was owed" to Massachusetts "nor did it order that any payment be made." *Id.* The "judgment," the Court held, "t[old] the United States that it may not disallow the reimbursement on the grounds given." *Id.* at 910. It was "thus . . . likely that the Government w[ould] abide by" the granted "declaration and reimburse" the respondent. *Id.* But the Supreme Court found that result did not implicate the Tucker Act, noting that "to the extent that the District Court's judgment" resulted in reimbursement, the "outcome" would be "a mere by-product of that court's primary function of reviewing the Secretary's interpretation of federal law." *Id.*

Precedent may also lend some support to the notion that similar remedies might be treated differently depending on what rights violation they are justified by. For example, the general rule is that district courts may not order the release of funds owed by the government. But the *Bowen* Court noted that "undo[ing] the Secretary's refusal to reimburse" Massachusetts based on a statutory violation would have been "within the District Court's jurisdiction" "to award complete relief." *Id.* at 910. And take *NIH*. In that case vacatur was permitted when it operated on a guidance document, but not when it operated on a grant termination, even though the grant termination was related to the guidance document. 145 S. Ct. at 2661 (Barrett, J., concurring). Or take *Megapulse*, where the court held that the district court could award an injunction on a non-contractual (Trade Secrets Act) claim, even though the CFC might not be able to offer similar relief,[9] specific performance, on a contract claim:

> It is clear to us that so long as an action brought against the United States or an agency thereof is not one that should be classified from the outset as a "contract action" for Tucker Act purposes, its remedies are also not contract-related, and the mere fact that an injunction would require the same governmental restraint that specific (non)performance might require in a contract setting is an insufficient basis to deny a district court the jurisdiction otherwise available and the remedial

---

[8] *Bowen* included a forceful dissent by Justice Scalia.

[9] Injunctions and specific performance are similar, yet theoretically distinct, remedies. *See* Samuel L. Bray, *The System of Equitable Remedies*, 63 UCLA L. Rev. 530, 556–57 & n.122 (2016).

powers otherwise appropriate. We find no limits, imposed by sovereign immunity, on the district court's jurisdiction to consider and grant (if appropriate) Megapulse's request for injunctive relief.

*Megapulse*, 672 F.2d at 971.

Now turning to the remedial requests in this case. First, take the request to "[e]njoin" Education "from denying continuation funding based on . . . viewpoint-based criteria" allegedly in violation of the First Amendment. [1] at 26. That is a request for an injunction against future First Amendment violations: a classic remedy in the First Amendment context. *Bowen* stated that "tell[ing] the United States that it may not disallow [funding] on the grounds given," when those grounds are non-contractual, is not a contractual remedy. *Bowen*, 487 U.S. at 910. The same was true in *NIH*, where Justice Barrett's controlling concurrence found that the district court likely could vacate the guidance documents, which might impact the grant terminations, even if the district court likely could not vacate the grant terminations themselves. 145 S. Ct. at 2661 (Barrett, J., concurring). The particular request for relief here—an injunction that certain non-contractual grounds cannot form the basis of non-continuation decisions—appears similar. And again, "to the extent that the" injunction might result in grant funding down the line, that "outcome" would be "a mere by-product of th[e] court's primary function of reviewing [Education's] interpretation of federal law" and thus not inherently contractual. *Bowen*, 487 U.S. at 910; *accord NIH*, 145 S. Ct. at 2661 (Barrett, J., concurring).

Second, take the request to "[v]acate and set aside the Notices of Non-Continuation and Denials of Request for Reconsideration issued to" plaintiffs based on the theory that they violated the First Amendment. [1] at 26. Vacatur is a request to "undo" Education's "refusal to [award new grant funding]" based on reasons prohibited by the Constitution, which is a remedy *Bowen* suggests does not always implicate the Tucker Act. *Bowen*, 487 U.S. at 910. Yet, *NIH* and *California*—which are more recent and more factually similar than *Bowen*—suggest the remedy is contractual, as explained previously in this opinion. That is because vacatur of a grant non-continuation is materially equivalent to vacatur of a grant termination, and vacatur of a grant termination is beyond a district court's jurisdiction under *NIH* and *California. See* Section III(A)(1), *supra*. And the reason for that is fairly obvious. Vacating a contractual action to restore the contractual relationship, even on First Amendment grounds, does not merely cause a chain of events that might impact a contract. *See Bowen*, 487 U.S. at 910. Rather, vacatur directly "reinstate[s]" the contract. *NIH*, 145 S. Ct. at 2661 (Barrett, J., concurring).

These decisions highlight the murkiness of Tucker Act precedent. One possibility is that what matters for purposes of the *Megapulse* test is the right which justifies the remedy. In other words, if the first *Megapulse* prong, the source of the rights, is not contractual, the remedy is not contractual either. Indeed, *Megapulse* itself suggests that, as explained above. But *NIH* and *California* cast doubt on that

25

interpretation of precedent. In *NIH*, the Justices seemed to agree that the guidance documents and the grant terminations were related. Chief Justice Roberts seemingly would have taken that to mean that the right which justified vacatur of the guidance documents was non-contractual and thus vacatur of the grant terminations could be done by a district court. *Id.* at 2663 (Roberts, C.J., concurring in part and dissenting in part). And that view might have stemmed from *Bowen*. *See Bowen*, 487 U.S. at 910 (noting that "undo[ing] the Secretary's refusal to reimburse" Massachusetts based on a statutory violation would have been "within the District Court's jurisdiction" "to award complete relief"). Yet, despite *Bowen*, the majority of the Supreme Court disagreed, looking not to the rights violation which might justify vacatur, but rather the impact vacatur would have on the contractual obligations of the parties. *See NIH*, 145 S. Ct. at 2661 (Barrett, J., concurring) (citing *California*, 604 U.S. at 650–51). And that inclines the court to conclude that vacatur of the grant non-continuation decision—even if done on First Amendment grounds—is contractual.[10]

Third, take the requests to "[o]rder" Education "to, consistent with [the law], review [p]laintiffs' eligibility for a continuation award and" "to release funding" "if necessary." [1] at 26. Those remedies are straightforwardly contractual requests for money damages or specific performance, as explained previously, because they request the release of contractual funds or that the court order Education to take actions in accordance with contractual terms. And plaintiffs seem to acknowledge as much. When asked at oral argument how an order to "release funding" on a contract would not be contractual, plaintiffs essentially argued that the request was added in error in the haste of fast-moving litigation and clarified that they were not seeking to

---

[10] One other feature of *NIH* that gives the court pause is also worth noting. The upshot of the court's holding today is that part of this suit must go to the CFC, but part of it stays here—at least for now. Such splitting up of lawsuits is no doubt not in the interest of judicial economy. Yet *NIH* (and *Evers* too) might require such a result. There is a difference, however, between those cases and this one: in this case only one government action—the decision not to continue grant funding (including both the non-continuation notices and the denials of reconsideration)—is challenged; in contrast, *NIH* and *Evers* each involved multiple government actions (*e.g.*, both guidance and grant terminations in *NIH*) and the distinction between district court and CFC jurisdiction tracked the distinction between challenges to different government actions. No similar distinction is available here since all counts challenge the same government action. Not only that, in this case plaintiffs by and large request the exact same remedies for Counts VII and VIII as they do for their other counts. And that further gives the court pause about its jurisdiction. Case after case charges courts with "mak[ing] rational distinctions between actions sounding genuinely in contract and those based on truly independent legal grounds." *Megapulse*, 672 F.2d at 969–70. Splitting up challenges to one governmental action, where all those challenges by and large request the exact same remedies, into multiple cases seems quite irrational. Indeed, plaintiffs argued at the status hearing held on April 20, 2026, that the entire case belongs together. *See* [41]. Moreover, the majority of the claims in this case are contractual, leaving the court with real concern that Counts VII and VIII should be treated as contractual too. Yet the precedent in this area, while not exactly on point, has split up cases. So the court, with doubt, follows suit.

26

release funding. 6/8/2026 Hr'g Tr. at 108–09. But plaintiffs have not amended these requests out of the suit. And inasmuch as plaintiffs can be understood to have acknowledged that these requests are contractual, that indicates to the court that what plaintiffs are really after in this suit is relief on their contract—a fact seemingly relevant under the commonsense *Megapulse* test.

But while these remedies are requested, the *Megapulse* test also directs courts to consider whether a requested remedy is "appropriate," 672 F.2d at 968. The court finds that this remedial request is arguably not appropriate, in the sense contemplated by *Megapulse*, to remedy a violation of the First Amendment.

In this case, specific performance or money damages related to the grant contract would be unjustified as a First Amendment remedy. "[T]he nature of the [underlying legal] violation determines the scope of the remedy." *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 16 (1971). That means that "[a] remedy is justifiable only insofar as it advances the ultimate objective of alleviating the initial [legal] violation" which justifies relief. *Freeman v. Pitts*, 503 U.S. 467, 489 (1992). But plaintiffs ask for relief untethered to their First Amendment claims. Even if (contrary to the prediction in the court's separate simultaneous opinion) plaintiffs were to prevail on their First Amendment claims, all that would do is erode the particular basis Education gave to discontinue funding; and that might justify remedies classically available in the First Amendment context, such as an injunction against future First Amendment violations or steps to remediate past ones. But even if plaintiffs could establish their First Amendment claims, that does not mean Education lacks any justifiable reason to discontinue funding on the terms of the grant. Nor would it mean that any of the other conditions required for plaintiffs to be entitled to grant funding are met. And any ultimate entitlement to grant funding would not be the result of First Amendment rights—it would be the result of contractual rights. Thus, specific performance requiring Education to take action on the grant contract, or an order releasing funds owed on the grant contract, would exceed the scope of the First Amendment claims. *See id.* At least in a colloquial sense, then, those remedies are inappropriate.

While those remedies are inappropriate in the sense described above, the court is not familiar with any other court which has considered a requested remedy "inappropriate" for purposes of the *Megapulse* inquiry for the reasons described above. The language from *Megapulse*—that courts should consider "the type of relief sought (or appropriate)," 672 F.2d at 968—also admits of a different interpretation: that courts should look to appropriate remedies litigants declined to request for the purposes of evading the Tucker Act (such as, in this case, money damages for a breach of contract claim, which plaintiffs did not bring), not that courts should lop off types of "relief sought" when litigants ask for unjustified contractual remedies (such as, in this case, the request for an order to release funding that plaintiffs said was added in error). Again, given the complexity of these issues, the relatively sparse briefing the court has received, and the expedited timeline it has been operating on, the court

finds it prudent not to definitively decide how exactly these remedy requests factor into the *Megapulse* analysis.

The source of the rights plaintiffs assert in Count VII are not contractual. But at least some of the remedies requested plausibly are contractual. When asked at oral argument whether plaintiffs know of any cases where the two *Megapulse* factors point in opposite directions, plaintiffs noted that they were unaware of any. 6/8/2026 Hr'g Tr. at 160. Some precedent suggests that in such situations, the nature of the rights controls. *See Atterbury*, 805 F.3d at 408. Nevertheless, the court finds it prudent to give the parties a targeted opportunity to address this issue. And the dearth of precedent on this issue is a further reason to delay a final ruling.[11]

\*

Count VIII alleges that Education violated the First Amendment by "[c]onditioning federal funds on the grantee's agreement not to engage in protected speech even when engaging in activities that are not funded by the federal government." [1] ¶ 110. This theory is substantively identical to the last for purposes of the jurisdiction analysis, so the result is the same. Any First Amendment right against the alleged conditions placed upon plaintiffs is not dependent on the contract's terms or a contractual relationship. But the requested remedies are all identical, and therefore similarly problematic.

\* \* \*

Defendants' motion to dismiss [28] for lack of jurisdiction is granted in part (as to Counts I–VI) and continued in part (as to Counts VII–VIII). While the court's jurisdiction over Counts VII and VIII is likely but unclear, under the Tucker Act and Little Tucker Act the Court of Federal Claims has exclusive jurisdiction over Counts I–VI, so those counts are dismissed.

Dated: June 26, 2026                                    /s/ Martha M. Pacold

---

[11] Plaintiffs have also requested a declaratory judgment. As noted previously, whether the court has jurisdiction to enter a declaration on plaintiffs' First Amendment rights is tied to whether it otherwise has jurisdiction to entertain plaintiffs' First Amendment theories. *See* Section III(A)(1), *supra* (citing *Skelly Oil*, 339 U.S. at 671). For the reasons just stated, that question is a difficult one which the court does not resolve today.

28